UNITED STATES of America, Plaintiff–Appellee,

v.

Dean William COTNAM and Phillip Zadurski, Defendants–Appellants.

Nos. 95–2943, 95–3137.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1996.

Decided July 8, 1996.

Isaias Ortiz, Thomas P. Schneider, Michele Leslie (argued), Office of the U.S. Atty., Milwaukee, WI, for U.S.

Robin Shellow, Angela Conrad (argued), Milwaukee, WI, for Dean W. Cotnam.

James R. Troupis, Timothy Finley (argued), Michael, Best & Friedrich, Madison, WI, for Phillip Zadurski.

Before POSNER, Chief Judge, and FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Dean William Cotnam pled guilty to conspiracy to possess with intent to distribute LSD. His plea was conditioned on the allowance of this appeal to challenge the district court's partial denial of his motion to suppress and the determination of his sentence. Phillip Zadurski was convicted by a jury of 1) conspiracy to possess with intent to distribute LSD, 2) possession with intent to distribute LSD, and 3) possession with intent to distribute cocaine. He appeals the LSD convictions, claiming that prosecutorial misconduct, particularly remarks that implicitly commented upon his failure to take the stand, resulted in a constitutionally deficient trial. We affirm Cotnam's conviction and sentence and reverse Zadurski's conviction.

## I.

The indictment in this case charged three men: Dean William Cotnam, David Martin, and Phillip Zadurski. All three men were charged with 1) knowingly and intentionally conspiring to possess, with the intent to distribute, LSD, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 2) knowingly and intentionally possessing, with the intent to distribute, LSD, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In addition, Zadurski was charged with knowingly and intentionally possessing, with the intent to distribute, cocaine, in violation of 21 U.S.C. § 841(a)(1). Cotnam and Martin pled guilty to the conspiracy with intent to distribute LSD charge. Zadurski went to trial.

### A. Cotnam

During the afternoon on March 1, 1995, the Milwaukee County Sheriff's Department received a call from a manager of the Motel 6 located at 5037 South Howell Avenue in Milwaukee, Wisconsin. The manager reported that motel cleaning personnel had observed what appeared to be marijuana in a clear plastic baggie on a nightstand in Room 224. Around 6:00 p.m. that evening, Milwaukee Sheriff's Deputies Lent, Pagan, and Rutter went to the Motel 6 to investigate. The motel registry revealed that Room 224 was registered to a "Michael J. Williams," later determined to be Dean William Cotnam.

The deputies proceeded to Room 224 and knocked on the door. When the person inside asked who was at the door, they responded "police." Cotnam then opened the door, stepped outside, and pulled the door shut behind him, which locked automatically. Cotnam testified that he knew the door would lock when he pulled it shut. He was wearing a tee shirt, jeans, and no shoes. Deputy Lent informed Cotnam that they were officers from the Milwaukee County Sheriff's Department and that they had received a complaint regarding his room. Lent asked whether they could go inside to discuss

the matter, but Cotnam responded that he had just locked himself out. When the officers asked him about his identity, Cotnam likewise responded that his identification was locked inside the room. Deputy Rutter then went to the motel office to get an extra key, while Deputies Pagan and Lent remained outside Room 224 with Cotnam.

Deputy Lent told Cotnam that they had received a complaint regarding marijuana use in his room and that marijuana had been seen on his nightstand. At this point Cotnam admitted to having marijuana in the room, though he stated that it was only one half ounce for personal use. Deputy Rutter then returned with the key and extended it to Cotnam. Instead of accepting the key, however, Cotnam gestured toward the door, indicating to the deputies that they were welcome to open it themselves.[1] No verbal consent was requested or given. After Deputy Rutter opened the door, Cotnam walked inside, followed by the deputies. The deputies immediately observed a clear plastic baggie on the bed, which contained a green leafy substance that they recognized as marijuana. A backpack, a jacket, and a phone book were also on the bed. On the nightstand there was a pager and various papers, including partially completed United Parcel Service shipping documents, a Western Union receipt, and a white envelope. The officers observed two partially smoked marijuana cigarettes in an ashtray on a shelf across from the bed.

The motel room was small, approximately 10 feet by 11 feet. Deputy Rutter testified that he believed that Cotnam was under arrest when they saw the marijuana on the bed, though they did not immediately tell him he was under arrest or handcuff him, since he was being cooperative.[2] Deputies Lent and Rutter also testified that they were concerned about safety and the possible presence of weapons when they first entered the room. Deputy Rutter conducted a pat down search of the jacket on the bed, which dis-

---

1. Cotnam denies making any such gesture, but Deputies Lent and Rutter testified that the gesture was made and that they interpreted it as an invitation to open the door. The magistrate judge credited the testimony of the deputies over

that of Cotnam, and the district court adopted her recommendations.

2. Cotnam was formally placed under arrest after the search of his room was completed.

closed what felt like two large bundles of money. Deputy Rutter asked Cotnam how much money was there, and Cotnam responded "maybe $5000 or $6000." When Deputy Rutter again asked Cotnam how much was there, he responded "$6700." After the money was retrieved, Deputy Lent counted it and found that it totalled $6700. The officers neither requested nor received verbal consent to search the room.

The deputies seized the marijuana, the money, the backpack, the pager, the phone book, and the papers from the nightstand, believing the documents could be evidence of the shipping of marijuana proceeds. The officers then allowed Cotnam to gather his personal belongings, handcuffed and searched him, and took him into custody. According to the written policy of the Milwaukee County Sheriff's Department, the officers were required to look at each seized item, document what it was, place it in an evidence bag, tag the evidence bag, and put it in the secure evidence lockup. While Deputy Rutter was doing this inventory, he opened the white envelope and inside discovered a folded newspaper wrapped around 3000 units of LSD on blotter paper. At a later point, Deputy Lent re-inspected the backpack—apparently looking for some form of identification, since they were having trouble determining Cotnam's identity—and this time discovered an additional 14,000 units of LSD on blotter paper.

Cotnam moved to suppress the money, the marijuana, and all of the LSD. Two separate evidentiary hearings were held. The first two-day hearing was before Magistrate Judge Patricia J. Gorence, who recommended that the motion be granted regarding the 14,000 units of LSD, but denied as to the rest of the evidence. Judge Thomas J. Curran held a further evidentiary hearing and then adopted the magistrate's recommendation to suppress the 14,000 units and allow the rest of the evidence.[3] Cotnam entered a conditional plea of guilty to the conspiracy charge. He reserved the right to challenge the district court's suppression rul-

ing and the calculation of his sentence under 21 U.S.C. § 841(b)(1)(A)(v), the statutory mandatory minimum, rather than under the Sentencing Guidelines. Cotnam was sentenced to 120 months imprisonment, five years of supervised release, a $1500 fine, and a $50 special assessment.

## B. Zadurski

On March 3, 1995, two days after the arrest of Dean Cotnam, City of Oak Creek police arrested David Martin at the Ramada Inn at 6041 South 13th Street in Milwaukee. Detective John Edwards had received information from a confidential informant that individuals staying in Room 107 at the Ramada Inn had large quantities of LSD and marijuana and were selling out of their room. Detective Edwards learned from motel personnel that the room had been receiving numerous telephone calls and visitors and was registered to a Tracy Dutkiewicz. A criminal history check on Dutkiewicz revealed that she, along with a man named David Martin, had been previously arrested and charged in Milwaukee County.

Detectives Edwards and John Siarkiewicz proceeded to Room 107, where they discovered Dutkiewicz and Martin, whom they questioned about the complaints of narcotics trafficking. Although Dutkiewicz and Martin denied any knowledge of such activities, when Officer Edwards patted Martin down for safety purposes, he discovered marijuana in Martin's pocket. Martin was then arrested. When asked why he didn't have any luggage, Martin stated that his luggage was in the red station wagon of a friend who had just left. No sooner had Martin completed this story when a taxi driver knocked on the motel room door and stated that he had Martin and Dutkiewicz's luggage in his cab. Martin later consented to a search of this luggage, which revealed 3000 hits of LSD in a plastic baggie wrapped up in a USA Today newspaper and an additional 488 hits of LSD wrapped in a magazine. Two days later the officers determined that the LSD previously found in Cotnam's room and the LSD found

---

**3.** The district court found that the second search of the backpack was not an inventory search and was not valid under any other exception to the warrant requirement. The suppression of the 14,000 units of LSD is not at issue in this appeal.

in Martin's suitcase were both wrapped in a February 28, 1995 issue of USA Today. Dutkiewicz was released after Martin stated that she had not participated with him in the sale of narcotics.

After Martin was taken into custody, he provided information linking Phillip Zadurski to drug trafficking. Martin told Detective Edwards that a man named "Phil" had gone with Martin two days previously to purchase LSD. Martin told the police that Phil had then "fronted" a pound of marijuana and 100–200 hits of LSD to someone else at the Ramada Inn and would be coming back to get the money that was owed to him later that day. Martin said that Phil would arrive in a white 1976 Lincoln Continental and that there would likely be cocaine, LSD, and marijuana in a backpack in the trunk of the car. Martin also stated that Phil's girlfriend Michelle would be driving the car and that there would be a baby in the backseat. Martin and Dutkiewicz also provided Officer Edwards with a physical description of "Phil."

Dutkiewicz agreed to allow Detective Edwards to wait for Phil with her in her room at the Ramada Inn, and she called Phil to make sure he was coming. Although Martin had stated that Phil would arrive around 4:30 p.m., he actually arrived around 7:00 p.m.— he had notified Dutkiewicz that he was running late. The car was as Martin had described, was driven by a woman (later determined to be Michelle Blanchette), and there was a baby in the back seat. When Zadurski came to Room 107, detectives answered the door and confronted him with the allegation that he was there to pick up drug money and that he was believed to be transporting drugs. Zadurski refused to speak with the officers or to identify himself.

Outside the hotel room other officers obtained Blanchette's consent to search the car. In a backpack in the trunk of the car, they discovered approximately 18.5 grams of cocaine in gem-sized baggies, two scales, a cloth bag containing numerous clear plastic baggies, a roll of unused gem-sized baggies, and approximately 12 grams of marijuana. Police did not, however, find any LSD in the knapsack, in the car, or on Zadurski's person.

Martin pled guilty to conspiracy with intent to distribute LSD and testified for the government at Zadurski's trial.[4] Martin testified that Zadurski was the middleman in various LSD transactions between Martin and Dean Cotnam. According to Martin, on February 28 or March 1, 1995, he and Zadurski went to the Motel 6, where Zadurski purchased the LSD from Cotnam. Martin testified that after the sale Zadurski and Cotnam came out to Martin's car, and the three men shared a marijuana cigarette together. Martin also testified that Zadurski had been the middleman for two to three LSD transactions during December of 1994,[5] involving between 100 to 500 hits of LSD each time. The LSD was sold in sheets of 100 hits at $90 per sheet. Martin testified that he would page Zadurski to tell Zadurski that he had money to buy LSD and then Zadurski would purchase the LSD from Cotnam. Zadurski's pager number was written in Martin's phone book; and Cotnam's pager number was written in Zadurski's address book. As middleman, Zadurski would make a profit on each sale. Martin also testified that the sales increased in volume during February of 1995, when he made purchases through Zadurski of 10, 20, and 40 sheets at a time (on three separate occasions) at $80 per sheet. He testified that the final sale on February 28 or March 1 involved 40 sheets.

Martin's testimony was the foundation of the government's case on the two LSD charges against Zadurski. Zadurski did not testify, and his primary strategy to challenging the LSD charges consisted of attacking the credibility of Martin.[6] On cross examination Martin admitted to regularly using LSD, that he had developed a tolerance for the

---

4. In exchange for Martin's testimony, the government agreed to dismiss the possession with intent to deliver LSD charge against him and to recommend to the sentencing judge that he be sentenced below the ten year minimum for the conspiracy charge.

5. Martin initially testified that these transactions occurred in "the fall" of 1994, but he later stated that they occurred in December of 1994.

6. Zadurski did not seriously dispute the cocaine charge, however, and he does not challenge the cocaine conviction on appeal.

drug and would do as many as 10 hits at one time, and that he sometimes hallucinated and would see and hear things that weren't really there. He also acknowledged that he often confused dates, times, and places.

During the government's closing argument, various statements were made by the prosecutor that Zadurski now challenges as being unconstitutional commentary on his failure to testify. The prosecutor twice referred to the government's case generally as "uncontroverted" and four times referred specifically to the testimony of David Martin as "uncontroverted." In particular, the prosecutor urged the jury to find Martin credible *because* his testimony was uncontroverted. He stated, "Now, the defendant will argue that Martin is not credible, although the evidence I just discussed is basically uncontroverted." The prosecutor also referred to the specific details of Martin's testimony and stated: "Those are specifics that only a credible witness could give. Again, uncontroverted. Did you hear any evidence that controverted Mr. Martin on [the] specifics of the conspiracy?"

While the prosecutor did acknowledge that Zadurski had no obligation to put on evidence, he did so in a way that the district court determined drew attention to Zadurski's failure to take the stand. After reviewing the government's case, the prosecutor commented, "Now, it's kind of hard to figure out where the defendant is going on this. As you know, he has no obligation at all to put in any kind of evidence." He later added, referring to the cocaine found in Zadurski's bag, "Now, but of course the defendant wants to deny that. He takes the position that's not mine, that's not mine. That's who knows who that belongs to. And he doesn't have to put evidence on, don't misunderstand the government's position."

The prosecutor in his closing argument repeatedly vouched for the strength of the government's case and, in particular, for the credibility of David Martin. The prosecutor

made the following statements: 1) "[P]art of the agreement is also that Mr. Martin testify truthfully. And the government submits he has testified truthfully"; 2) "Martin was also credible as to his testimony on the possession to distribute LSD, on the 4,000—as to the 4,000 hits of LSD. He's credible on that the government would submit"; 3) "[Martin and Zadurski] talked specifically about the possibility of taking over the LSD market in the area. And [Martin] was very credible on that"; 4) "So if you believe Martin, and Martin we submit is very credible on that issue, and all critical issues in this case, Martin also testified that ... he was able to observe how the defendant packaged this cocaine. And if you recall, he said that—that he had seen the defendant package this cocaine in various ways. He was very forthright about that." Defense counsel did not object to any part of the prosecutor's closing argument.

After the one and a half day trial, the jury deliberated for over five hours before returning a verdict of guilty against Zadurski on all three counts. After dismissing the jury, the district court judge called a sua sponte mistrial hearing based on the prosecutor's remarks during closing arguments. The court focussed on three factors that caused it "considerable concern": the "numerous occasions" on which the prosecutor characterized the testimony of government witnesses, and particularly David Martin, as "uncontroverted"; the prosecutor's repeated vouching for the testimony of Martin; and "several instances" of a "subtle reference to the fact that the defendant did not testify" by the way that Zadurski's right not to testify was invoked.[7] The court recognized that it is a violation of the defendant's right not to testify to make indirect comments, including references to "uncontroverted" testimony, "when the statement was, *as in some instances in this case*, manifestly intended to indicate to the jury that the only one who could have controverted it was the defendant

7. The court later summarized:
So, it appears that we really have three instances in the closing argument that are violations of what this court understands to be the standard rules of the Seventh Circuit: One is the reference to the uncontroverted and uncontradicted testimony; the other is the vouching for the testimony of Martin; and the third one is the repeated or at least the three times reference to the fact that the defendant is not required to take the stand or words to that effect.

who remained silent throughout the trial" (emphasis added). After reviewing the remarks about "uncontroverted" testimony and the statements that Zadurski didn't need to put on evidence or testify, the court stated, "I find it difficult to construe those statements in any other way other than as focussing on the fact that the defendant did not testify."

The court stated that, after considering that the remarks were not made in bad faith, that the jury was instructed that the defendant had the right not to testify, and that the jury should be assumed to follow the instructions given, that it initially felt these factors sufficient to mitigate "the serious prejudicial effect" of the prosecutor's remarks. The court continued, however, by stating that the jury's deliberating for five to five and a half hours had caused it to re-examine its position: "And whether or not these prejudicial references did in fact impact on their verdict is something that I'm not able of course to answer. It's a very, very serious and a very close question." The court acknowledged that it felt the evidence against the defendant was "overwhelming," but it remained "deeply concerned" about the potential prejudicial impact of the prosecutor's improper remarks, particularly in light of the length of the jury's deliberations.[8]

The court allowed both sides to present arguments on whether a mistrial should be declared. The government's lawyers repeatedly conceded that the remarks were "improper," at least "in isolation," and admitted that the remarks were "serious" in nature. Yet they insisted that the remarks had no prejudicial impact because the evidence against Zadurski was overwhelming. Defense counsel argued for a mistrial and stated that he had not objected during the prosecutor's closing argument because he did not want to call further attention to the improper statements.

The court then concluded by outlining the factors to be considered in its decision: 1) the nature and seriousness of the prosecutorial misconduct, 2) whether the improper remarks were invited by defense counsel, 3) whether the court had instructed the jury to disregard the remarks, 4) whether defense counsel had an adequate opportunity to counter the remarks, and 5) the weight of the evidence. The court found that although the prosecutorial misconduct was serious and the defense counsel had not invited the improper remarks, the other three factors weighed against granting a mistrial. In the end, the court concluded as follows:

On the basis of balance, and I must say that the scale is almost evenly balanced, the court feels that after careful consideration, and recognizing that we don't have what's known as perfect trials, but we try very hard to have fair trials, and I'd have to conclude that the prejudicial remarks of the prosecutor, while adversely affecting the rights of the defendant, were not sufficient to have deprived him of a fair trial, and the court will, therefore, enter a judgment of conviction in accordance with the three counts returned by the jury.

The court made this determination even after acknowledging the centrality of David Martin's testimony to the government's case on the two LSD charges: "And the court recognizes that absent Mr. Martin's case—Martin's testimony, I can only speculate that a verdict of guilty probably would not have been forthcoming at least as to two counts."

## II.

### A. Cotnam

■ When reviewing a district court's denial of a motion to suppress, we review the district court's determinations of probable cause and reasonable suspicion de novo. *Ornelas v. United States,* —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We review the district court's findings of historical

---

8. The court stated that it did not raise the issue earlier because it considered the money and effort that went into trial and felt that 1) a verdict of not guilty would have avoided the need for retrial, and 2) a very quick verdict of guilty would have assured the court that the jury also found the evidence overwhelming. The court lamented, however, that "[n]either of these two possibilities occurred"—the verdict was guilty, but the length of the deliberations "for a case as simple as this one, doesn't shed the light that the court had hoped that it would on this very, very difficult decision."

fact, however, only for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at ——, 116 S.Ct. at 1663.

■ The Fourth Amendment prohibits the police from making a warrantless nonconsensual entry into a suspect's home in order to make a routine felony arrest or to conduct a search. *Payton v. New York,* 445 U.S. 573, 576, 586, 100 S.Ct. 1371, 1374–75, 1380, 63 L.Ed.2d 639 (1980); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). This protection of the home against warrantless entries has been extended to hotel rooms. *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *United States v. James,* 40 F.3d 850, 874 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995); *United States v. Diaz,* 814 F.2d 454, 458 (7th Cir.), *cert. denied,* 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987).

■ A person can, however, consent to the entry of their home or hotel by officers, and consent need be neither express nor verbal. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *United States v. Rosario,* 962 F.2d 733, 736 (7th Cir.1992). While Cotnam denies making any gesture to the deputies to go ahead and open the door, he cannot establish that the finding of the magistrate judge (which the district court accepted) that he gestured to Deputy Rutter that he could use the key to unlock the door was clearly erroneous. This finding was supported by the testimony of the two deputies who testified, and it was reasonable for the officers to conclude that the gesture indicated consent to enter the room.[9] After the door was opened, Cotnam led the deputies into the room and never objected to their entering. The district court did not find, however, that the gesture indicated consent to search the room. As the magistrate judge noted, "inviting someone into the foyer of one's home is not an invitation or a consent to search the house." There is nothing unreasonable

about such a finding, and we reject Cotnam's argument on appeal that it was clearly erroneous to conclude that the gesture amounted to consent to enter, but not to search.

■ Upon entering Room 224, the officers observed the marijuana in plain view on the bed. Since the officers had the legal right to be in the room when they saw the marijuana in plain view, they were entitled to seize it. *United States v. Berkowitz,* 927 F.2d 1376, 1388 (7th Cir.1991) ("A warrantless seizure is justified under the plain view doctrine if the officer has a legal right to be in the place from where he sees the object subject to seizure and a 'lawful right of access to the object itself,' and if the object's incriminating nature is 'immediately apparent.'") (citing *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990)). And when the deputies saw the marijuana, after Cotnam had already confessed to possessing it, they certainly had probable cause to arrest Cotnam.

■ The magistrate judge found that Cotnam was "under arrest" once the marijuana was observed, even though he was not formally arrested or handcuffed until later (though one of the officers testified that he considered him under arrest at this point). She essentially determined that with the power to arrest came the power to search incident to arrest, citing *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). Thus she concluded that the officers were entitled to search Cotnam's person and the area within his immediate control in order to protect themselves from danger and to prevent the destruction of evidence. *Id.* We are concerned by that fact that Cotnam was not actually "arrested," as we commonly use the term, until after the search that was supposedly "incident" to arrest. We conclude, however, that the searches that followed the viewing of the marijuana fall under the inevitable discovery rule. *See United States v. Fialk,* 5 F.3d 250, 252 (7th Cir.1993) ("Under the inevitable discovery doctrine, illegally obtained evidence that is normally suppressed

---

9. Cotnam's counsel argues in his appellate brief that any gesture was actually Cotnam's nonver-

bal refusal to take the key. There is no support in the record for this claim.

under the exclusionary rule may be admitted if it would have been discovered even without the unlawful police activity."); *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509–10, 81 L.Ed.2d 377 (1984).

■ It is clear from the officers' testimony and the objective evidence that Cotnam was destined to be arrested soon after he confessed to possessing marijuana and marijuana was found in his room. While it would have been preferable for the officers to arrest him as soon as they saw the marijuana, i.e., before the subsequent searches, we find that the evidence discovered during these searches would lawfully have been found anyway before the officers left the motel room. Our recent opinion in *United States v. Jones,* 72 F.3d 1324, 1329–34 (7th Cir.1995), relied upon the inevitable discovery doctrine in almost exactly the same situation. Although the defendant in *Jones* was searched before there was probable cause to search him, we found that the evidence discovered in this search would inevitably have been discovered anyway, as soon as the officers completed their search of the defendant's home, for which they had a warrant. We recognized that the results of the lawful home search gave the officers probable cause to arrest the defendant and that in a lawful search incident to arrest, they would have discovered the evidence sought to be excluded. We noted in *Jones* that the defendant did not deny the government's claim that this hypothetical arrest and search would in fact have inevitably occurred. *Id.* at 1330 n. 8. In general, the government must establish by a preponderance of evidence not only that there would have been probable cause for a lawful search, but that the search in fact would have occurred. *Id.; United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir.1995). We are convinced that both the arrest of Cotnam and the search incident to arrest, with the resulting discovery of evidence, were indeed inevitable in this sense. In such a situation, "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509.

In the case of such a small motel room, the officers could lawfully search the room and

check under the bed for persons or weapons as part of a search incident to arrest. *United States v. Bennett,* 908 F.2d 189, 193 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). In addition, they were entitled to pat down the defendant's jacket, which was laying on the bed next to where the defendant was standing, for weapons. When Deputy Rutter discovered what appeared to be wads of money in the coat, Cotnam admitted that the coat contained as much as $6700 in cash. Thus the district court did not err in refusing to suppress the money and the marijuana found in the room.

■ Cotnam does not deny that it was reasonable for the arresting officers to seize the papers and documents on the nightstand, which they believed could be evidence that Cotnam was about to disburse the marijuana proceeds (i.e., the $6700 cash). The 3000 units of LSD that were later discovered within the seized white envelope, which was found during the administration of a valid, written inventory procedure, were properly found to be admissible evidence. Evidence discovered during such a regularized inventory process is admissible evidence. *Colorado v. Bertine,* 479 U.S. 367, 374–75, 107 S.Ct. 738, 742–43, 93 L.Ed.2d 739 (1987). Inventory policies can require the opening of closed containers and the listing of their contents. *Id.; Illinois v. Lafayette,* 462 U.S. 640, 648, 103 S.Ct. 2605, 2610–11, 77 L.Ed.2d 65 (1983). Thus we reject all of Cotnam's challenges to the district court's partial denial of his suppression motion.

Cotnam's sentencing appeal was simply that if the Supreme Court reversed our decision in *United States v. Neal,* 46 F.3d 1405 (7th Cir.) (affirming calculation of mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A)(v) using weight of LSD carrier paper, rather than under U.S.S.G. § 2D1.1 by presumed per dose weight), *cert. granted,* —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995), he wanted to be a beneficiary and to be resentenced according to the method of the Sentencing Guidelines. The Supreme Court has since unanimously affirmed our decision, thus negating Cotnam's appeal in this regard. *Neal v. United States,*

— U.S. ——, ——, 116 S.Ct. 763, 764, 133 L.Ed.2d 709 (1996) ("We hold that § 841(b)(1) directs a sentencing court to take into account the actual weight of the blotter paper with its absorbed LSD, even though the Sentencing Guidelines require a different method of calculating the weight of an LSD mixture or substance.").

## B. Zadurski

Zadurski argues that various remarks during the prosecutor's closing argument unconstitutionally infringed upon his Fifth Amendment right not to testify. He also argues that the prosecutor's vouching for the strength of the government's case and the testimony of David Martin violated his due process right to a fair trial.[10]

■ Direct comment on a defendant's failure to testify is forbidden by the Fifth Amendment. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We have repeatedly recognized that indirect commentary on a defendant's failure to take the stand can also constitute a violation of the defendant's Fifth Amendment privilege not to testify. A prosecutor's comment that the government's evidence on an issue is "uncontradicted," "undenied," "unrebutted," "undisputed," etc., will be a violation of the defendant's Fifth Amendment rights if the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself. *Freeman v. Lane*, 962 F.2d 1252, 1261 (7th Cir.1992) (repeated remarks that evidence was "unrebutted and uncontradicted" violated Fifth Amendment); *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1302 (7th Cir.1985) (same for "uncontradicted and undenied"); *United States v. Buege*, 578 F.2d 187, 189 (7th Cir.) (same for "uncontradicted"), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978); *United States v. Fearns*, 501 F.2d 486, 490 (7th Cir.1974) (same for "undisputed"); *United States v. Handman*, 447 F.2d 853, 855 (7th Cir.1971)

(same for "unchallenged" and "uncontradicted").

■ We have consistently emphasized that such references violate the Fifth Amendment only when "it is highly unlikely that anyone other than the defendant could rebut the evidence." *Freeman*, 962 F.2d at 1260 (quoting *United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir.1988)); *Buege*, 578 F.2d at 189 (finding violation "where it is highly unlikely that at least a portion of the testimony could have been contradicted by anyone other than the defendant"); *Williams v. Lane*, 826 F.2d 654, 665 (7th Cir.1987) (quoting *Buege*); *Burke*, 756 F.2d at 1301 (same); *see also United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir.1987) (Fifth Amendment forbids comment on failure to call witnesses "when the only potential witness was the defendant himself"), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). Our test for a Fifth Amendment violation of this sort is as follows:

> The right against self-incrimination is violated only when "1) it was the prosecutor's manifest intention to refer to the defendant's silence, or 2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence."

*Rodriguez v. Peters*, 63 F.3d 546, 561 (7th Cir.1995) (quoting *United States v. Donovan*, 24 F.3d 908, 916 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994)); *United States v. Ashford*, 924 F.2d 1416, 1425 (7th Cir.), *cert. denied*, 502 U.S. 828, 112 S.Ct. 98, 116 L.Ed.2d 69 (1991); *DiCaro*, 852 F.2d at 263; *Williams*, 826 F.2d at 664; *Burke*, 756 F.2d at 1300; *Buege*, 578 F.2d at 188; *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.), *cert. denied*, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968).

■ A general prosecutorial misconduct charge alleging a due process violation of a defendant's right to a fair trial is evaluated under a slightly different test. As the

---

10. In addition, Zadurski argues that the government asked various improper leading questions of Martin and misstated the evidence presented during its closing argument summation. Because the focus of the district court's mistrial

hearing and of this appeal is on the other claims, however, and because we reverse Zadurski's LSD convictions on these grounds, we do not address his other claims.

Supreme Court recognized in *Darden v. Wainwright*, 477 U.S. 168, 181–82, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986), improper prosecutorial comments that do not implicate specific constitutional rights of the accused, such as the right to counsel and the right to remain silent, are evaluated to determine whether they deprived the defendant of a fair trial. *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (noting the distinction). In this situation, we first look at the disputed remarks in isolation to determine if they are proper. If they are improper, we then consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial. *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.), *cert. denied*, 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293, and, 510 U.S. 820, 114 S.Ct. 76, 126 L.Ed.2d 44 (1993); *United States v. Pirovolos*, 844 F.2d 415, 425 (7th Cir.), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). From *Darden* we have developed a five-factor test for determining "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871). The criteria to be considered are as follows: 1) the nature and seriousness of the prosecutorial misconduct, 2)

whether the prosecutor's statements were invited by impermissible conduct by defense counsel, 3) whether the trial court instructed the jury to disregard the statements, 4) whether the defense was able to counter the improper statements through rebuttal, and 5) the weight of the evidence against the defendant. *Rodriguez*, 63 F.3d at 558; *Badger*, 983 F.2d at 1450; *Pirovolos*, 844 F.2d at 426. General prosecutorial misconduct, such as vouching for the credibility of government witnesses and misstating evidence, should be evaluated according to these five factors. *United States v. Severson*, 3 F.3d 1005, 1014 (7th Cir.1993) (vouching); *Badger*, 983 F.2d at 1451 (misstating evidence).[11]

■■■ We review a district court's decision not to grant a mistrial for abuse of discretion. *United States v. Humphrey*, 34 F.3d 551, 556 (7th Cir.1994); *United States v. Canino*, 949 F.2d 928, 937 (7th Cir.1991), *cert. denied*, 503 U.S. 996, 112 S.Ct. 1701, 118 L.Ed.2d 410, *and*, 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992).[12] Yet we review de novo a district court's determination of the appropriate legal standard to apply, recognizing that application of the wrong legal standard may well lead to a decision that is in fact an abuse of the district court's discretion to grant or deny a mistrial. *Cf. McFarlane v. Life Ins. Co. of North America*, 999 F.2d 266, 267 (7th Cir.1993); *Daniels*

---

**11.** We have, on occasion, evaluated claims that a prosecutor's comments infringed upon a defendant's right not to testify under this due process test, rather than the specific Fifth Amendment test. See, e.g., *United States v. Reed*, 2 F.3d 1441, 1449–50 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 898, 127 L.Ed.2d 90 (1994); *United States v. Osuorji*, 32 F.3d 1186, 1191 (7th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 919, 130 L.Ed.2d 799 (1995). While the appellants in these cases may have framed their appeals as due process claims, and recognizing that a violation of a defendant's right not to testify would also result in a denial of due process, a claim that a prosecutor improperly commented upon the defendant's failure to testify is most properly considered first under the traditional Fifth Amendment test outlined above. See, e.g., *Rodriguez*, 63 F.3d at 558, 561–62 (separately analyzing Fifth Amendment prosecutorial comment claim and due process prosecutorial comment claim); *United States v. Goodapple*, 958 F.2d 1402, 1405, 1409–10 (7th Cir.1992) (same).

**12.** Because defense counsel failed to object to any of the challenged remarks at trial, we would normally review the remarks only for plain error. FED. R. CRIM. PRO. 52(b). *United States v. Penny*, 60 F.3d 1257, 1264 (7th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). Yet Zadurski argues, citing *Handman*, 447 F.2d at 855 n. 5, that the district court's sua sponte mistrial hearing on these precise issues preserved the matter for review and obviates the need to apply the plain error standard. We need not address this contention, however, because the government has not argued for the plain error standard of review. Thus the government has waived the right to invoke this standard, and we evaluate Zadurski's claims "without the screen of the plain error standard." *United States v. Johnson*, 26 F.3d 669, 678–79 (7th Cir.) (quoting *United States v. Leichtnam*, 948 F.2d 370, 375 (7th Cir.1991)), cert. denied, —— U.S. ——, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994); *United States v. Malin*, 908 F.2d 163, 167 (7th Cir.), cert. denied, 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990).

**499**

v. *Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir.1991); *Torres v. Wisconsin Dep't of Health and Social Services*, 859 F.2d 1523, 1528 (7th Cir.1988), *cert. denied*, 489 U.S. 1017, 109 S.Ct. 1133, 103 L.Ed.2d 194, *and*, 489 U.S. 1082, 109 S.Ct. 1537, 103 L.Ed.2d 841 (1989). We applaud the district court's vigilance in calling the mistrial hearing sua sponte and in specifically noting the prosecutor's numerous improper remarks, without the aid of any objections by defense counsel. We likewise commend the seriousness and candor with which the district court evaluated the remarks and their significance. We reverse Zadurski's conviction not because we disagree with the district court's appraisal of the prosecutor's comments, but because the conclusion appears unavoidable—based upon the district court's own language and findings—that if the court had applied the appropriate test in evaluating the remarks, it would have found a non-harmless violation of Zadurski's Fifth Amendment right not to testify.

█ It appears obvious that using the word "uncontroverted" in referring to government evidence—which was this particular prosecutor's favorite—where it is highly unlikely that anyone beyond the non-testifying defendant could contradict the evidence, is just as improper as using the words "uncontradicted," "undenied," "unrebutted," "undisputed," and "unchallenged" in the same situation. Furthermore, the district court specifically found that, at least "in some instances in this case," the prosecutor's use of the word "uncontroverted" was "manifestly intended to indicate to the jury that the only one who could have controverted it was the defendant who remained silent throughout the trial." The further finding that the prosecutor's remarks would naturally and necessarily be taken as a comment on the defendant's silence is also implicit in the district court's findings. After considering the combined effect of the remarks about "uncontroverted" evidence and

the context of the prosecutor's remarks about Zadurski's right not to testify, the court concluded, "I find it difficult to construe those statements in any other way than as focussing on the fact that the defendant did not testify."

One example may be helpful in illustrating why the prosecutor's remarks indirectly commented upon the defendant's failure to take the stand. After discussing what Martin had testified to regarding discussions about drug dealing, the prosecutor stated as follows: "Not only did the discussions deal with the 4,000 hits of LSD purchased on March 1st or thereabout, but also you will recall again the testimony by Martin, again uncontroverted, that the defendant and Martin talked about drug dealings, about distributing LSD." During direct examination, however, the prosecutor had asked the following question of Martin regarding these discussions about drug dealing in Milwaukee: "When these discussions were taking place between the defendant and yourself, did you keep the discussions basically to yourself or were other people around the house?" Martin responded, "For the most part we tried to keep the discussions somewhat to ourselves except for the fact of [sic] our girlfriends who were sometimes present." Thus it is apparent that, at least for some of these discussions, only Zadurski himself could have refuted Martin's version of what was said. The district court determined that such prosecutorial statements were a "violation" of "the standard rules of the Seventh Circuit." We agree. At least some of the prosecutor's remarks about uncontroverted evidence unconstitutionally infringed upon Zadurski's Fifth Amendment right not to testify. The government essentially conceded as much at the mistrial hearing, when it acknowledged that certain comments were "improper" and "serious," and also in its brief on appeal.[13]

█ Nonetheless, we will only reverse Zadurski's conviction if this constitutional vi-

**13.** The government states in its brief:
  The government agrees that the prosecutor's remarks regarding the "uncontroverted" nature of the evidence and Martin's testimony could be construed to refer, at least indirectly, to Zadurski's failure to testify, in which case

they would be improper [citations omitted]. Like other constitutional errors, this error requires reversal unless the government can demonstrate that the error was harmless beyond a reasonable doubt.

olation was not harmless. *Ashford*, 924 F.2d at 1425. "Once a constitutional violation has been established, the government can only prevail if it sustains the burden of proving beyond a reasonable doubt that the defendant would have been convicted absent the prosecutor's unconstitutional remarks." *Burke*, 756 F.2d at 1302; *see Pirovolos*, 844 F.2d at 425; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). The district court did not actually undertake the harmless error analysis, since it focussed on the due process question and found Zadurski had not been deprived of a fair trial. The government's best argument that the Fifth Amendment violation was harmless is the district court's statement that it found the evidence against Zadurski "overwhelming."[14] *See Burke*, 756 F.2d at 1302 ("[T]he case against the defendant must be 'overwhelming' to apply the harmless error rule.") This statement, however, must be considered in light of all of the district court's other commentary.

■ The court was very disturbed by the fact that the relatively lengthy jury deliberations appeared to indicate that the *jury* did not find the evidence overwhelming. The court also recognized "the serious prejudicial effect" of the prosecutor's remarks and noted that whether these remarks impacted the jury's verdict was not something he could determine with confidence: "It's a very, very serious and a very close question."[15] The court later stated, while considering whether the prosecutor's comments denied Zadurski a fair trial, that "the scale is almost evenly balanced." Furthermore, the district court acknowledged the centrality of Martin's testimony to the government's case on the LSD

charges. While the jury was certainly entitled to believe Martin if it found him credible, there were plenty of reasons for a juror to find him non-credible: 1) he lied to the police about the location of his luggage; 2) he was a convicted felon already serving a sentence in Wisconsin for an earlier crime; 3) he was testifying in exchange for having a charge dropped and a potentially lighter sentence; 4) he was often vague and sometimes contradictory about specific details, like the dates and circumstances of various drug deals; and 5) he was an admitted heavy user of LSD who experienced many debilitating effects from the drug use. In such a situation, the prosecutor's repeated vouching for Martin's credibility—which the district court properly found to be a violation of standard Seventh Circuit principles[16]—was especially prejudicial to Zadurski. See *Handman*, 447 F.2d at 856 (concluding that government vouching for witness "aggravated the improper comments on [the defendant's] exercise of his Fifth Amendment right").

■ When we consider the district court's pronounced uncertainty about the effect of the prosecutor's remarks—which we share—particularly when combined with the inherent prejudice of the government's vouching for its key witness on the LSD charges, we simply cannot conclude that the prosecutor's inappropriate comments were harmless beyond a reasonable doubt. And it appears that the district court would not have found them harmless either. Because the prosecutor's comments infringed upon the defendant's right not to testify and were not harmless—at least not in combination with the extensive vouching—we conclude that the district court abused its discretion in not declaring a mistrial for Zadurski. While various of the aforementioned remarks by the prosecutor standing alone would not have

---

14. The government's brief improperly states that the test for harmlessness is the five-factor due process test outlined above and uses this test to argue that the prosecutor's unconstitutional comments were harmless. As noted earlier, this five-factor test is used to determine whether prosecutorial misconduct denied a defendant a fair trial; it has nothing to do with whether a Fifth Amendment violation was harmless or not.

15. The district court also spoke of being "deeply concerned" and that it was facing a "very, very difficult decision."

16. We have consistently recognized that it is generally improper for the government to vouch for the credibility of its witnesses. *Severson*, 3 F.3d at 1014; *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir.1988).

necessitated a new trial, the combined impact of all of the remarks mandated that a mistrial be declared.

For the foregoing reasons, we AFFIRM the conviction of Dean Cotnam and REVERSE the two LSD convictions of Phillip Zadurski.