**UNITED STATES of America,
Plaintiff,**

v.

**Mark A. ELDER, Defendant.**

**No. 04–CR–20049.**

United States District Court,
C.D. Illinois,
Urbana Division.

Jan. 19, 2005.

Eugene Miller, Office of U.S. Attorney, Urbana, IL, for Plaintiff.

Ronald F. Tulin, Ronald Tulin, Ltd., Charleston, IL, for Defendant.

## ORDER

McCUSKEY, Chief Judge.

This case is before the court for ruling on Defendant's Motion to Suppress Warrantless Search (# 12). An evidentiary hearing was held on the motion on November 15, 2004, and the parties have submitted additional briefs to the court following the hearing. Following this court's careful consideration of the evidence presented at the hearing and the arguments of the parties, Defendant's Motion to Suppress Warrantless Search (# 12) is DENIED.

## FACTS

On August 5, 2004, Defendant, Mark A. Elder, was charged by indictment with the offenses of: (1) knowingly manufacturing a substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(B)(1)(c) and 18 U.S.C. § 2; and (2) knowingly possessing a firearm in furtherance of a crime in violation of 18 U.S.C. § 924(c). On October 25, 2004, Defendant filed a Motion to Suppress Warrantless Search (# 12) and a Memorandum in Support (# 13). On November 12, 2004, the Government filed its Response (# 19).

As noted, an evidentiary hearing was held on November 15, 2004. The evidence at the hearing showed that, on April 21, 2004, around 5:00 p.m., Defendant's father, David Elder, placed a 911 call from Defendant's residence located in rural Humboldt, Illinois, in Coles County. Mr. Elder did not identify himself. The pertinent portions of his call are as follows:

911: Police, fire or ambulance?

Caller: I need the sheriff's department.

911: Ok, can you tell me what is going on?

Caller: I think we got meth out here.

Caller: _____ things that look pretty suspicious, they're flying like quails.

911: Are people leaving at this time?

Caller: Yes.

911: Ok, can you tell me what they're driving?

Caller: Red cars. Do you know where I am?

The caller then hung up. The dispatcher called the number Mr. Elder had called from, but no one answered.

Following this call, Officer John Jean, a deputy with the Coles County Sheriff's department, received information from the dispatcher that an individual needed assistance and that it had something to do with methamphetamine. Jean traveled to Defendant's residence. Jean testified that the property was located in a rural area and consisted of a single-story house and numerous outbuildings. Jean observed no "no trespassing" signs, gates or fences on the property. Jean did not know Defendant and had never been to the property before. Jean went to the house and knocked on the door several times. He also knocked on the back door and some windows of the house but got no answer. Jean testified that he heard a television on in the house and was able to see the television playing.

Officer Scott Robison, also a deputy with the Coles County Sheriff's department, arrived at the property about 15 to 20 minutes after Jean had arrived. Robison had never been to the property before. Robison and Jean started looking at the outbuildings on the property. Jean testified that, based upon their training and experience, they were aware that the manufacture of methamphetamine can be dangerous. This is because of the volatility of the manufacturing process itself, which includes the danger of explosion, fire and fumes, and also because those who manufacture methamphetamine very often possess and use firearms. Robison testified that he was concerned that someone at the residence, specifically the 911 caller, might be in need of help.

One of the outbuildings the officers approached was a barn, or shed, located off of the driveway to the left. This building was 168 feet from the road, 94 feet from the back door of the house, and 75 feet from the corner of the house. The shed was open on the south side to a fenced horse pasture. The shed had doors on the east and west side. Jean testified that the door off of the driveway was all the way open. Jean testified that he looked into the open door and saw plastic bottles with hoses located just inside the door. He also smelled anhydrous ammonia. Jean testified that he believed, based upon his experience, that this was evidence of meth manufacture and he contacted the East Central Illinois Drug Task Force (ECITF) about these observations. Robison testified that he walked through the open door about 10 feet inside the shed and saw what appeared to be a methamphetamine lab. He testified that he saw glass jars with salt residue, a gas generator, and a pop bottle with clear tubing attached to the top. Robison testified that he smelled the odor of ether, which indicated the production of methamphetamine. Robison testified that it was dark in the shed, but he was able to see. There were open areas which allowed light to get into the shed. Robison stated that he exited the shed and continued to search the rest of the property for the caller.

After Jean's call about his observations, members of ECITF arrived at the residence. James Hite, an inspector assigned to ECITF, testified that he arrived around 6:30 p.m. Mr. Elder arrived at the residence about 10 or 15 minutes later. Mr. Elder told Hite that he had placed the 911 call after he found what he believed was a meth lab in the shed. Mr. Elder also stated that Defendant's wife, Wendy Elder, was at his house with two of her children. Hite testified that he asked Mr. Elder to bring Wendy Elder back to the

residence. Hite testified that, when Mr. Elder returned to the residence with Wendy Elder, he asked Wendy Elder for permission to search the house and outbuildings. Hite testified that she consented to the search. He did not have her sign a written consent form. He and the other agents then searched and secured the house and searched the shed. Hite testified that, if Wendy Elder had not consented to the search, he would have obtained a search warrant. He testified that he had enough information at that time to obtain a search warrant. During the search, evidence of methamphetamine manufacture and use was found in the shed. Two rifles were found in the house, as well as some evidence of methamphetamine use.

Defendant testified that he lived at the residence with his wife and three children. He testified that the property was only used by his family. The shed had a hook on the door. Defendant testified that there were some materials used for the manufacture of methamphetamine on a bench on the back wall of the shed and that everything else was in a storage closet. He testified that he had a right of privacy in the shed because he was making methamphetamine there. Defendant testified that, on April 21, 2004, two friends, John Webb and Jason Swango, came to his residence. Several other friends arrived later. These friends parked by the shed and went out to the shed and were using methamphetamine. Then they went inside the house. When his father, Mr. Elder, came into the house and confronted him, he and his friends left the residence. Defendant testified that he did not give anyone permission to use the shed. He testified that he kept a rubber raft, a weed mower and fishing equipment in the shed.

Mr. Elder testified that he lives three miles from Defendant and his family. He testified that he went to Defendant's residence the afternoon of April 21, 2004, and entered the shed. While there, he saw a trash bag in the shed which contained what looked like the remains of a meth lab. Mr. Elder testified that he always closes the door when he leaves the shed. He testified that, when he left that day, he closed the door and replaced the hook. He went to Defendant's house and tried to talk to Defendant, but Defendant and his friends left hurriedly, and he was not able to talk to Defendant. Mr. Elder testified that he was very angry and called 911. He then had second thoughts, returned to the shed, took the bag containing garbage and put it in his truck. Mr. Elder testified that he again closed the door of the shed and replaced the hook. He then went to his house.

He returned to Defendant's residence later and saw Coles County deputies and several task force agents at the residence. He was asked to get Defendant's wife and left to pick up Wendy Elder at his house. Mr. Elder testified that Wendy Elder gave the agents permission to search the house but was never asked for permission to search the shed. He also testified that, when he returned to the residence with Wendy Elder, agents were already in the shed searching. Wendy Elder testified and corroborated Mr. Elder's testimony that she was asked for permission to search the house but was not asked for permission to search the shed. Wendy Elder also testified that she saw agents in the shed bringing things out when she and Mr. Elder arrived at the residence. During cross examination, Mr. Elder admitted that he had no independent recollection of closing and latching the door to the shed. However, he testified that it was his habit to latch the door when he left the shed. Following the hearing, Defendant filed a Brief in Support of Motion to Suppress (# 21) with attached exhibits (# 22, # 23). The Government subsequently filed a Re-

sponse to Defendant's Brief in Support of Motion to Suppress (# 24).

## ANALYSIS

In his Brief, Defendant argues that the deputies and task force agents had no right to search the shed without a search warrant and that the evidence seized from the shed should be suppressed. Specifically, Defendant contends that his Fourth Amendment rights were violated because Officer Robison should not have entered the shed and because the task force agents searched the shed without consent.

A warrantless search is per se unreasonable unless the police are able to show that it falls in one of a carefully defined set of exceptions based on the presence of exigent circumstances. *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir.2000). A police officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless search; instead, the test is an objective one. *See Richardson*, 208 F.3d at 629.

This court notes that it found all of the witnesses who testified at the hearing to be credible, notwithstanding the inconsistencies in the testimony presented. Based upon the evidence, this court first concludes that Robison did not violate Defendant's Fourth Amendment rights when he entered the shed following the 911 call. This court finds that the shed was open, as Jean and Robison testified. Although Mr. Elder provided contrary testimony, he stated on cross-examination that he had no independent recollection of closing and latching the shed, but based his testimony that he closed the door on the fact that it was his habit to do so. This court agrees with the Government that Mr. Elder's testimony, based upon his habit, is not sufficient to outweigh the testimony of Jean and Robison, based upon their recollection, that the door was open.

This court concludes that, under the circumstances of this case, it was reasonable for Robison to enter the shed briefly to look for the 911 caller. This court agrees with the Government that the very fact that the caller dialed 911 reasonably allowed the officers to believe that the caller felt that a situation existed which required an emergency response, rather than a non-emergency situation where the caller could have simply called the sheriff's office directly. In *Richardson*, the Seventh Circuit specifically recognized that "[m]any 911 calls are inspired by true emergencies that require an immediate response." *Richardson*, 208 F.3d at 630. The court also stated:

A 911 call is one of the most common-and universally recognized-means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help. This fits neatly with a central purpose of the exigent circumstances (or emergency) exception to the warrant requirement, namely, to ensure that the police or other government agents are able to assist persons in danger or otherwise in need of assistance. [Citations omitted]. The efficient and effective use of the emergency response networks requires that the police (and other rescue agents) be able to respond to such calls quickly and without unnecessary second-guessing. As then-Circuit Judge Burger stated in *Wayne*, "[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process."

*Richardson*, 208 F.3d at 630, *quoting Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963); *see also United States v. Jenkins*, 329 F.3d 579, 581–82 (7th Cir.

2003); *United States v. Brown*, 64 F.3d 1083, 1086–87 (7th Cir.1995) (police officers' decision to take a brief look inside apartment was reasonable where officers had legitimate concerns about the occupant's safety).

In *Richardson*, the Seventh Circuit emphasized that a court must apply an objective standard in determining whether exigent circumstances exist based upon a 911 call. *Richardson*, 208 F.3d at 630. The court found that the circumstances there, which involved a 911 call where the caller identified himself and reported a murder at a particular residence which he described as a "drug house," justified the actions of police officers in entering and searching the home without a warrant. *See Richardson*, 208 F.3d at 630–31. The court noted that the officers testified that, because laypersons are not in a position to determine whether a person is dead or alive and because someone who appears dead might revive with medical treatment, they assume that anyone reported dead might be alive unless the report comes from qualified personnel such as a paramedic unit. *Richardson*, 208 F.3d at 631. The court stated that it agreed with the district court that "the situation presented exigent circumstances on these particular facts." *Richardson*, 208 F.3d at 631.[1]

In the case at hand, a 911 call was made and the caller reported "meth," that things looked "pretty suspicious" and that people were "flying like quails." The caller then hung up and did not answer when the dispatcher tried to call the residence. When Jean and Robison arrived in response to the call, Jean could see a television on in the residence, but no one answered the door. Under these circumstances, this court agrees with the Government that it was reasonable to conduct a search of the outbuildings to try to locate the caller.[2]

In doing so, this court notes that the brief entry of the shed by Robison was clearly less intrusive than a search of a residence. "The less intrusive a search, the less justification is required." *Brown*, 64 F.3d at 1086. In fact, this court believes there is a real question regarding whether Defendant had a legitimate expectation of privacy in the shed. "[A] defendant objecting to the search of a particular area bears the burden of proving a legitimate expectation of privacy in the area searched." *United States v. French*, 291 F.3d 945, 951 (7th Cir.2002). A reasonable expectation of privacy exists when "(1) the complainant exhibits an actual (subjective) expectation of privacy and, (2) the expectation is one that society is prepared to recognize as reasonable." *French*, 291 F.3d at 951. There does not appear to be any dispute that the shed in this case was not within the curtilage of the home. *See French*, 291 F.3d at 951–52. However, Defendant contends that police officers had no right to enter the shed. Defendant relies on *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir.2001), and *People v. Pitman*, 211 Ill.2d 502, 286 Ill.Dec. 36, 813 N.E.2d 93 (2004). This court concludes that *Siebert*, a civil case, is distinguishable. In that case, the defendant, a volunteer for the Illinois Department of Agriculture, en-

---

**1.** In *Richardson*, the police officers did not find any evidence of a murder in the house, but instead found marijuana, crack cocaine and drug-packaging materials. *Richardson*, 208 F.3d at 628.

**2.** Defendant argues that there was nothing about the 911 call that would "indicate that officers had any reason to think there was someone in need of help." Defendant seems to be arguing that, based upon the call, reasonable officers would think the people had left in their "[r]ed cars" so there could not be any immediate danger. This court disagrees and concludes that, under these facts, the officers had an objective, reasonable basis to be concerned about the safety of the 911 caller.

tered the plaintiffs' barn in response to a complaint that the plaintiffs' horses were in a fenced area with no food or water. The district court had granted summary judgment for the defendant, and the Seventh Circuit reversed, concluding that the plaintiffs had a reasonable expectation of privacy in the barn which had doors which were often kept locked and which was located in a fenced-in area of the property. *Siebert,* 256 F.3d at 654. In this case, the shed was not located in a fenced-in area of the property, but was located off the driveway, and the door to the shed was open when Jean and Robison approached the shed in responding to the 911 call.

■ This court also concludes that *Pitman* does not help Defendant's cause. In *Pitman,* the Illinois Supreme Court held that police officers violated the Fourth Amendment when they entered a barn without a warrant and without consent. *Pitman,* 286 Ill.Dec. 36, 813 N.E.2d at 104–09. However, the *Pitman* case did not involve a response to a 911 call. Moreover, the Government correctly points out that a decision of a court of the State of Illinois regarding the proper interpretation of the Fourth Amendment to the United States Constitution is not controlling in a federal court and has limited persuasive value. In determining whether there has been an unreasonable search and seizure by state officers, a federal court must only look to federal law. *See Gordon v. Degelmann,* 29 F.3d 295, 301 (7th Cir.1994); *see also United States v. Wilson,* 169 F.3d 418, 423–24 (7th Cir.1999) (federal standards apply to the interpretation of the Fourth Amendment). In addition, in his dissent in *Pitman,* Justice Thomas specifically noted that the majority's conclusion that the defendant had a reasonable expectation of privacy in the barn "is at odds with all of the state and federal cases that have con-

sidered searches of barns or outbuildings located on farm property lying outside of the curtilage of a farmhouse." *Pitman,* 286 Ill.Dec. 36, 813 N.E.2d at 110 (Thomas, J., dissenting).

This court also notes that Defendant seems to base his argument, in part, on his testimony that he had an expectation of privacy in the shed because he was manufacturing methamphetamine in the shed. However, an expectation of privacy based on illegal activity is not one that society is prepared to recognize as legitimate. *See Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("a 'legitimate' expectation of privacy means more than a subjective expectation of not being discovered"). In addition, Defendant's testimony that he did not give anyone permission to use the shed was contradicted by his own testimony that his friends were in the shed the day of the search and by Mr. Elder's testimony indicating that he was often in the shed.

For all of the reasons stated, this court concludes that it is questionable whether Defendant had a legitimate expectation of privacy in the shed but, even if he did, the actions of the police officers in looking in and briefly entering the open door of the shed in response to the 911 call was reasonable.

The next question is whether the EC-ITF agents violated Defendant's rights when they conducted their search of the shed. It is the Government's position, and Hite testified, that Wendy Elder gave consent for a search of the house and shed before either one was searched. Defendant contends, however, based upon the testimony of Mr. Elder and Wendy Elder, that consent was not given for a search of the shed and that the shed was already being searched before Hite asked Wendy Elder for permission to search the house.[3]

---

**3.** This court notes that Defendant has argued at length that the court should accept Defen-

dant's version of events on this point because

■ This court concludes that it does not need to resolve this factual issue because it agrees with the Government's alternative argument that the evidence should not be suppressed because it inevitably would have been discovered.

■ The inevitable discovery doctrine allows the use of evidence if the Government can show that the information "ultimately or inevitably would have been discovered by lawful means." *United States v. Brown*, 328 F.3d 352, 357 (7th Cir.2003), *cert. denied*, 540 U.S. 1113, 124 S.Ct. 1044, 157 L.Ed.2d 902 (2004), *quoting United States v. Gravens*, 129 F.3d 974, 979 (7th Cir.1997). To demonstrate that a discovery was truly "inevitable," the prosecution must establish that it had probable cause and prove the existence of "a chain of events that would have led to a warrant ... independent of the search." *Brown*, 328 F.3d at 357, *quoting Brown*, 64 F.3d at 1085. In other words, the government bears the burden of proving, by a preponderance of the evidence, that it would have been able to uncover the challenged evidence though lawful means. *Gravens*, 129 F.3d at 979-80; *see also United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir.1996) (the government must establish not only that there would have been probable cause for a lawful search, but that the search would have, in fact, occurred). The inevitable discovery doctrine is not an exception to be invoked casually and should be applied only where it is clear that "the deterrence rationale of the exclusionary rule has so little basis that the evidence should be

received." *Brown*, 328 F.3d at 357, *quoting Cotnam*, 88 F.3d at 496.

Defendant has not responded to the Government's inevitable discovery argument, even though it was raised in the Government's initial Response to Defendant's Motion to Suppress. After carefully considering the Government's argument, this court concludes that the doctrine clearly applies in this case. The record shows that David Elder's 911 call set in motion a "chain of events" that would have led to a warrant and search independent of any unlawful activity. Once Jean and Robison responded to the 911 call, and, in looking for the caller, discovered evidence of methamphetamine manufacturing in the shed, they passed this information on to the ECITF agents. At that point, the ECITF agents had enough information to obtain a search warrant. Therefore, even if Wendy Elder did not consent to a search of the shed, a search warrant would have been properly issued, based upon probable cause. *See United States v. Rucker*, 348 F.Supp.2d 981, 1004-05 (S.D.Ind.2004).

As the Seventh Circuit has cautioned, the exclusionary rule is a sanction that is supposed to be proportional to the wrongdoing that it punishes; "[t]he rule should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred." *Brown*, 328 F.3d at 357, *citing United States v. Salgado*, 807 F.2d 603, 607 (7th Cir.1986). In this case, this court has found that the officers were justified in

the Government did not call witnesses from the task force to testify that the shed was not searched prior to consent. Defendant has also argued that the investigative report prepared following the search supports his version because the report does not state that the search was conducted based upon consent. This court is not persuaded by either argument. Hite did testify that the shed was not searched prior to consent and this court

agrees with the Government that it was not required to call other ECITF agents to say the same thing. In addition, the fact that the investigative report does not state that the shed was searched based upon consent means little because it also·does not state that the house was searched based upon consent. There is no dispute in this case that Wendy Elder consented to a search of the house.

looking into and entering the shed because they had objective, reasonable concerns about the safety of the 911 caller. After they made their observations in the shed, they had enough information to obtain a warrant. Therefore, on this basis, this court concludes that the evidence seized from the shed would inevitably have been discovered when the officers obtained a search warrant. Accordingly, it is not subject to exclusion under the Fourth Amendment. *See Rucker*, 348 F.Supp.2d at 1004–05.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Suppress Warrantless Search (# 12) is DENIED.

(2) This case remains scheduled for a status conference by personal appearance on January 20, 2005, at 4:00 p.m.