**UNITED STATES, Plaintiff,**

v.

**Roger RUCKER, Defendant.**

**No. IP04–0074–CR–01–B/F.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 16, 2004.

---

Melanie Conour, United States Attorney's Office, Indianapolis, IN, for Plaintiff.

Steven M. Mondry, Mondry & Mondry Attorney's at Law, Maywood, IL, for Defendant.

## ENTRY DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

BARKER, District Judge.

Defendant Roger Rucker ("Rucker") is charged with two felony counts of possession with intent to distribute and conspiracy to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II, Narcotic Controlled Substance, all in violation of 21 U.S.C. § 841(a)(1). Theses charges arise in part from evidence obtained during a search of Rucker's apartment at 5050 South Lake Shore Drive, Chicago, Illinois on March 31, 2004.

This matter comes before the Court on Defendant's Motion to Suppress. An evidentiary hearing was held on November 5, 2004, which addressed Defendant's several challenges to the legality of law enforcement's initial protective sweep of his apartment, his detention by federal agents, and his eventual consent to search, which yielded certain physical evidence and inculpatory statements by the Defendant. For the reasons set forth in detail below, we *DENY* Defendant's Motion to Suppress, both as to the physical evidence that was seized and the statements he made to the agents.

### Factual Background

Beginning in December 2001, a task force composed of the Federal Bureau of Investigation ("FBI"), Indianapolis Police Department ("IPD"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and other law enforcement agencies had conducted an investigation of an alleged drug trafficking organization, known as the 34th Street Gang, operating in the Indianapolis, Indiana area. A suspected leader of this organization was co-defendant Prentice Davis ("Davis") and

one of his lieutenants was Dramane Johnson ("Johnson"). Through information obtained from confidential informants, law enforcement officers believed the 34th Street Gang distributed multi-kilogram quantities of both powder cocaine and crack cocaine and conducted drug sales from various locations in Indianapolis, Indiana, including a recording studio at 3334 North Temple Avenue (the "Temple Avenue studio").

From February 19, 2004, until March 30, 2004, federal agents monitored communications utilizing a pen register and trap and trace device, pursuant to a court order permitting them to be installed on Davis's telephone. These devices recorded information about the calls made to and from Davis's telephone, but not the content of the conversations. From the telephone numbers recorded by these devices, law enforcement officers were able to determine subscriber information, including names and addresses, for individuals with whom Davis conversed by phone. The pen register revealed a number of calls between Davis's telephone and at least two telephone numbers utilized by Defendant Rucker: one subscribed to in the name of R & R Investments, located at 5050 South Lake Shore Drive, Apartment 1910, in Chicago, Illinois, and the other subscribed to in his wife's name, Tawanda Miller. Federal agents, in researching the criminal histories of the individuals with whom Davis conversed, learned that Rucker had a 25-year-old conviction.[1]

On or about March 11, 2004, law enforcement officers undertook a court-authorized Title III interception of calls on the telephone utilized by Davis, which electronic surveillance continued through March 30 or 31, 2004. This wiretap led federal agents to believe there was a business relationship between Davis and Rucker; the first call between the two occurred on the first day of the wiretap,[2] followed by eleven other conversations intercepted and recorded between them. From the information gathered in the intercepted telephone calls, law enforcement officials came to believe that Davis was preparing to transport a large sum of money from Indianapolis, Indiana, to Rucker in Chicago, Illinois, for the purpose of obtaining multiple kilograms of cocaine.[3]

On March 29, 2004, following a number of calls concerning Davis's being "short" of money, Davis advised Rucker that he was no longer "short" and that he would therefore be leaving at the "regular time;" no mention was made of what the regular

---

1. Rucker's criminal record also contained a second, prior federal conviction for cocaine, although it is unclear when this conviction occurred and when law enforcement officers in Indianapolis first learned of it.

2. The first recorded call involved Davis telling Rucker about a stop by IPD officers of Johnson on March 11, 2004. Johnson was pulled over independently of the task force investigation and, as a result of the stop, one of the passengers in Johnson's car, a Mr. J. Rizzi, was arrested for possession of marijuana, and a weapon and $3,500 in cash were taken from Johnson.

3. FBI Agent Robert Brouwer ("Brouwer") conceded that the words "cocaine" and "money" were never explicitly used in the conversations between Rucker and Davis. However, it was his opinion, based on his substantial experience in investigating drug crimes, that these were the implicit topics of their conversations. For example, in one intercepted conversation, Rucker is heard in the background mentioning "half a thing," which Brouwer knew from experience typically refers to an amount of drugs that is half the quantity the parties usually deal in.

However, as the defense noted on at least one occasion, Rucker and Davis also discussed a musician, R. Kelly, and music recording, which was Davis's purported profession. Rucker testified that he had known Davis because he was involved in the recording industry and because Davis was an artist.

time was. Rucker agreed, responding that he would "set it up now." Acting in response to this conversation, federal agents initiated visual surveillance of Davis.[4] The next call between Davis and Rucker occurred at 8:30 a.m. the next day, on March 30, 2004, in which Rucker told Davis that he had been waiting since 6:00 a.m., to which Davis responded saying that he would be leaving Indianapolis about 9:00 a.m.

Shortly after this conversation, Davis left his residence and drove to his Temple Avenue studio where he entered the building and remained inside for a brief time. Davis then exited the studio carrying a black bag, which he placed in the trunk of his car. Davis then proceeded to Interstate 65 and drove north out of Indianapolis towards Chicago. Surveilling officers followed Davis on this trip to Chicago, not knowing his precise destination. While driving to Chicago, Davis unexpectedly was stopped for speeding by an Indiana State Trooper. The task force agents, concerned that this stop might compromise their investigation, contacted the Indiana State Trooper by radio, asking him to let Davis go.

During this traffic stop, while out of the presence of the State Trooper, Davis made several telephone calls. His first call went to "Little Meat"[5] and Davis asked to speak to "Shaw."[6] Davis told Shaw he had been pulled over and that, if he did not call back in thirty minutes, they should go to the Temple Avenue studio and "clean it out." Davis specifically directed Shaw to

look for a McDonald's bag. Following his release by the State Trooper, Davis again called "Little Meat" to inform him of his release. "Shaw" called Davis back to confirm that Davis had, in fact, been released. Davis also had called Rucker to inform him that he had been pulled over by the State Trooper, and later to inform him that he had been released. Neither time when talking to Rucker did Davis make mention of "cleaning out" anything.

After his release by the State Trooper, law enforcement surveillance of Davis continued, culminating in Davis's arrival at the Regents Park apartment complex at 5050 South Lake Shore Drive in Chicago, Illinois. Davis parked his car and was observed taking the black bag out of the trunk and entering the apartment building at approximately 1:00 p.m. Indianapolis time.[7] Surveillance continued and Davis was next seen leaving the building approximately two hours later, at 3:00 or 3:30 p.m., Indianapolis time.[8] Upon returning to his car, Davis again placed what was perceived now to be a heavy black bag in the trunk of his vehicle and covered it up. Officers maintained continuous surveillance of Davis during his return trip to Indianapolis. At one point, during the return trip, Davis stopped for gas and later stopped a second time for approximately one hour at a rest area. During both of these stops, Davis did not access the trunk of his car.

As Davis approached Indianapolis, he was stopped at approximately 6:50 p.m. for traveling at excessive speeds by a law

---

4. The surveillance continued until Davis's arrest at 7:00 p.m. on March 30, 2004.

5. "Little Meat" is Davis's common-law wife's girlfriend's brother.

6. Corey Stallworth, a/k/a "Shaw."

7. At this time, Chicago was one hour behind Indianapolis.

8. Davis was not under surveillance after he entered the apartment complex. Although the periphery of the apartment complex was under surveillance, federal agents were unable to follow him inside. Thus, they had no direct knowledge of how or where Davis spent those two hours inside the building, or indeed, whether he had managed to sneak out of the building and return later.

enforcement officer acting in concert with the Task Force investigators. The officer effecting the stop obtained Davis's consent to search his vehicle, found the black bag in the trunk, opened it, and discovered what appeared to be cocaine, which he seized. Davis was arrested. The seized substance was later tested and found to be approximately seven kilograms of cocaine. In searching Davis's car and person, officers also found two documents: the first, a piece of paper in Davis's pocket bearing the following notation: "Roger Rucker, 5050 South Lake Shore Drive, 1910 Chago, Illinois 6061;"[9] the second, a list of nine names and numbers, which, based on his experience, Special Agent Robert Brouwer ("Brouwer") identified as an "owe sheet," that is, a list of people to whom Davis owed money from drug deals.

Rucker made six calls to Davis's cellphone number after Davis had left Chicago, all of which calls went un-answered by Davis.[10] Rucker's first call was at 6:29 p.m., the approximate time Davis would have been expected to arrive in Indianapolis if he had not stopped for gas or stopped at the rest area. The first two calls occurred during Davis's drive from Chicago to Indianapolis,[11] and the remaining four calls occurred after Davis's cellphone had been seized by law enforcement officials.

Although Davis's cellphone had been seized following his arrest, investigating agents maintaining a wiretap on Dramane Johnson's telephone produced intercep-

tions of seven telephone calls from Karen Bledsoe ("Bledsoe") to Johnson, all of which were placed after Davis's arrest. The first of these calls occurred at 8:44 p.m. on March 30, 2004, when Bledsoe told Johnson that Davis had been arrested and further that he needed to "clean out" the Temple Avenue studio.[12]

During the course of this investigation, FBI Special Agent Michael Schulstad ("Schulstad") was the primary coordinator between the Indianapolis agents and the Chicago agents. SA Schulstad communicated with Special Agents Ron Cozile and John Derbeas ("Derbeas") in Chicago. According to the testimony at the hearing, the initial plan conceived by SA Schulstad and SA Derbeas had been to continue their task force investigation of Rucker by "walling off" the arrest of Davis, thereby hiding from Rucker and the other gang members the fact that Davis was a target of federal investigation. SA Schulstad kept SA Derbeas informed of developments in the Indianapolis investigation, including the telephone calls in Indianapolis to and from Johnson about "cleaning out" the Temple Avenue studio. However, after learning of the calls between Bledsoe and Johnson, SA Schulstad and SA Derbeas abandoned the walling-off approach as no longer feasible and undertook instead to secure and to execute search warrants.[13]

9. The note misspelled Chicago.

10. The times for the six calls were as follows: 6:29 p.m., 6:37 p.m., 7:00 p.m., 7:42 p.m., 8:30 p.m., all on March 30, and 6:55 a.m. on March 31.

11. No reason was advanced at the hearing why Davis failed to answer these first two calls.

12. Bledsoe apparently learned of Davis's arrest from a fellow inmate in the Marion County jail to whom Davis had passed a note since

he did not have access to a telephone in the jail.

13. The walling-off plan was abandoned primarily because the agents expected the principal and associates would follow the usual practice of abandoning their telephones after learning that a confederate has been caught, thereby preventing federal agents from obtaining any further wiretaps.

To prevent the destruction of evidence in Indianapolis, FBI agents and IPD officers went to three locations while waiting for search warrants to be prepared and presented to a magistrate judge: Davis's studio on Temple Avenue, a residence believed to be a stash house used by Davis on 37th Street, and Davis's personal residence.[14] When law enforcement officials arrived at these three premises they attempted to secure the locations by posting officers outside the buildings, thus preventing anyone from entering.[15] Dramane Johnson, who arrived at the studio after it had already been secured, went to a nearby location to wait. During this time period, the FBI continued to monitor Johnson's telephone calls and overheard seven calls from Johnson between 9:18 p.m. on March 30, 2004 and 3:05 a.m. on March 31, 2004. These calls involved several individuals not yet identified by law enforcement. The first call informed an unidentified individual that the FBI was in front of the studio. Johnson also arranged to have various unidentified individuals drive past the studio and inform him of what was happening. In addition, Johnson spoke to an unknown male about moving items in a shoe box (the agents inferred that the contents were money) from an unidentified location. Finally, Johnson discussed whether Davis could be bonded out as soon as possible. Johnson believed that the bond was $90,000 and, therefore, he and his associates needed to come up with $9,000 to free Davis. SA Schulstad informed SA Derbeas of all of these developments as they were occurring in Indianapolis.

While agents were securing the three Indianapolis locations, Special Agent Cannon was preparing applications for search warrants for them. In addition, he was attempting to forestall Davis's release on bond. Davis was transferred to federal custody at approximately midnight, Indianapolis time, on March 30, 2004, and a search warrant for the studio was issued at about 1 a.m. on March 31, 2004.[16] The subsequent search of the studio resulted in the seizure of approximately seven and one-half ounces (203 grams) of crack cocaine, packaging paraphernalia, three shotguns, and a loaded 9mm pistol.

At some point shortly after the arrest of Davis, FBI agents in Chicago decided to attempt to contact Rucker, knowing that Davis had been arrested in Indianapolis with the seven kilograms of cocaine and that attempts were being made in Indianapolis by associates of Davis to get rid of contraband.[17] Although the FBI had no direct information establishing that Rucker had by this time learned of Davis's arrest or had been tipped off concerning the need for him to "clean out" his 5050 South Lake Shore Drive Apartment,[18] the agents testified that they were concerned that Rucker might well have been contacted by an unknown associate whose tele-

14. The FBI agents' preparation of the probable cause affidavits following Davis's arrest had to await the agents' completion of their surveillance of Davis during his Chicago trip.

15. SA Brouwer testified that the officers who secured the buildings were not involved in conducting the surveillance of Davis.

16. Davis had initially been taken into state custody.

17. FBI SA Frank Jack Sodetz ("Sodetz") testified that he was contacted at approximately 7:00 p.m., Chicago time (8:00 p.m. Indianapolis time) on March 30, 2004 about the possibility of conducting a search of Rucker's apartment at 5050 South Lake Shore Drive.

18. None of the intercepted conversations indicated any attempts to contact Rucker. Moreover, the federal agents testified that they had no indication that Rucker knew about the surveillance of his apartment, the surveillance of Davis, or the arrest of Davis.

phone was not wiretapped.[19] The Chicago FBI agents thus decided they should go to 5050 Lake Shore Drive to attempt to talk with Rucker directly in order to secure, if possible, his consent for a search of his apartment, utilizing a "knock and talk" approach.[20]

FBI Special Agents, Sodetz, Bradley Hanner ("Hanner"),[21] Jay Emigh ("Emigh"), and Derbeas, along with four or five Chicago Police Department officers ("CPD" officers) led by Sargent Sanchez, assembled in a parking lot a block from the apartment complex at approximately 9:30 p.m. (Chicago time). The agents believed that Davis had obtained the seven kilograms of cocaine in his possession when he was arrested from Rucker's apartment earlier that afternoon in exchange for cash which Davis had carried to Chicago to pay him.[22] The FBI agents and CPD officers arrived at the Regents Park apartment complex between 9:45 p.m. and 10 p.m., where they conversed for an undetermined period of time with building security.[23] Building security personnel indicated that, though they knew Rucker, they were unable to say definitively if he was in the building at that time.[24] (Actual-

19. Federal agents knew Bledsoe talked to Johnson because Johnson's telephone was wiretapped, but there was no way for them to know who else she might have talked to, and there was no intercept on Rucker's telephone.

20. The "knock and talk" procedure has been described as follows:

[I]n a 'knock and talk,' the police approach a house or apartment in which they suspect drug dealing is occurring. They listen outside the door for a brief period of time, and then they knock on the door and attempt to persuade whoever answers to give them permission to enter. If consent is forthcoming, they enter and interview the occupants of the place; if it is not, they try to see from their vantage point at the door whether drug paraphernalia or contraband is in plain view. If it is, then they make a warrantless entry. As this description makes plain, the 'knock and talk' procedure typically does not involve the prior issuance of a warrant.

United States v. Johnson, 170 F.3d 708, 711 (7th Cir.1999).

21. Although SA Hanner was initially brought into the investigation of Davis and Rucker only as recently as the afternoon of March 30, 2004, he had already accumulated tips and evidence related to Rucker. SA Hanner had first learned that Rucker dealt in narcotics, cocaine in particular, during a confidential proffer interview in 2002. Before the events in this case, SA Hanner had obtained the 5050 Lake Shore Drive address for Rucker from a public records search and had visited the apartment complex. SA Hanner also had learned that Rucker had a federal drug charge for trafficking cocaine. He had investigative background information indicating that Rucker was connected with cocaine dealing in Los Angeles, California, and Beaumont, Texas, and had traced telephone numbers obtained in investigations back to Rucker. This information, however, did not find its way into a probable cause affidavit, nor is it clear when, if at all, SA Hanner communicated this information to other agents in Chicago or Indianapolis.

22. In SA Sodetz's experience, Chicago is regarded as a "source" city for narcotics. Indianapolis, in contrast, is a narcotics market. Generally, law enforcement officers expect to find narcotics traveling through Chicago to Indianapolis and the proceeds from drug sales moving in a reverse direction.

23. SA Hanner testified that the agents conferred with building security for approximately an hour. However, CPD Officer Murphy ("Murphy") testified that the entire encounter inside the apartment complex, including the protective sweep, took only a total of twenty-to-twenty-five minutes. SA Derbeas and Sgt. Sanchez were primarily engaged with building security, but neither testified at this hearing.

24. Apparently, the Regents Park security system tracks when a resident's electronic key is used to enter the building, but there is no record log of departures. Based on reports from Indianapolis, the agents in Chicago had reason to believe that Rucker had been present in the apartment earlier in the day when Davis visited the building, but they were unable to determine if he had subsequently departed.

ly, there was conflicting testimony as to whether building security knew if Rucker was in his apartment at that time.[25] Agents had determined that Rucker had an assigned parking space at the complex, but had discovered that it was unoccupied at the time law enforcement officials arrived. (There also was conflicting testimony as to whether agents learned of this empty parking space before or after the protective sweep had been performed.[26]) Around 10:30 p.m., Chris Toomer ("Toomer"), a building security officer, escorted the law enforcement officers upstairs to the nineteenth floor of the South tower, where Rucker's apartment was located.[27] Whether or not Toomer was told that the law enforcement officers had a warrant for Rucker's arrest is also unclear.[28]

Upon arriving on the nineteenth floor, the law enforcement officers arrayed themselves along the lengthy hallway corridor just outside apartment 1910 which they knew to be Rucker's entrance.[29] One of the agents knocked on the door, and there was no answer from inside. One of the agents then directed building security to telephone Rucker's apartment, and the officers outside heard the phone ringing inside the apartment; again, there was no answer. No one who testified could recall whether anyone looked through the peep hole in the door to see if any lights were on inside the apartment. However, SAs Hanner and Sodetz testified that no sounds were heard coming from Rucker's apartment while they waited outside the door.

25. SA Hanner testified that he recalled that building security employees told the law enforcement officers that they believed Rucker was not present. SA Sodetz testified that the building security employees could not tell them if Rucker was present because they did not know.

26. SA Hanner testified that they learned about Rucker's vacant parking spot before the agents were escorted upstairs to Rucker's apartment. However, SA Sodetz testified that he recalls that they learned about the parking spot after the protective sweep had been completed and the agents returned to the building lobby; in any event, there was nothing which would have prevented the agents from learning about the parking spot before the protective sweep was performed.

27. Regents Park has "secure" and "non-secure" parts of the complex. The general living areas are contained within the secure portion of the building. To access secure areas, a person either must be a resident or have an electronic security card. Accordingly, the law enforcement officials required the assistance of building security to admit them to the secure portion of the building. Regents Park also has two towers, a North Tower and a South Tower. There may also have been two apartments identified with the 1910 number, but this possible coincidence is immaterial to our case.

28. Special Agents Hanner and Sodetz, and CPD officer Murphy all testified they neither told nor heard anyone else tell Toomer or other building security employees that they possessed an arrest warrant for Rucker. However, Toomer wrote in his security incident report that law enforcement officers told him they had an arrest warrant for Rucker. Toomer also testified that he was told by someone that if he did not open the door, the law enforcement officers would break it down. This account was also disputed by the agents.

In fact, Toomer's account of events contained several inconsistencies, and it was not always clear from his testimony what information he used in preparing the security incident report and whether such information was acquired contemporaneously to the events described or acquired after the fact. We were left wondering if Toomer's somewhat jumbled account of events was the result of some need he perceived to minimize any culpability or failures on his part with his employer.

29. SA Sodetz described the hallway as quite long, and perhaps, ten-to-twelve feet wide.

The agents at this point briefly discussed leaving to obtain a search warrant, but, based on the reports from Indianapolis about the attempted evidence destruction, the agents feared that if someone currently was inside the apartment, evidence or contraband would be destroyed.[30] The agents testified further that they were concerned that their presence outside Rucker's apartment might have been revealed by their knocking on the door and the telephone call and, as a result, anyone who might have been present in the apartment would already likely be destroying evidence/contraband. The agents, therefore, decided the best course of action was to perform a "protective sweep" of the interior of the apartment to preserve any evidence that might be inside.[31]

At the request of the agents, Toomer unlocked the door[32] and was pushed aside almost immediately out of harm's way because the officers were unsure who or what might be behind the door. The officers announced their presence and entered the apartment. The lights were off inside and there was no observable movement.[33] The officers then performed a "slow, methodical room clear,"[34] which took between five and ten minutes to complete. The purpose of the "room clear" was to ensure that no one was present in the apartment to destroy evidence or threaten the safety of the officers posted outside the door. The agents testified that they had no intention of conducting a search of the apartment at this time and that they tried to disturb as little as possible. At some point during the sweep, CPD officer Murphy spotted a gym bag in the foyer closet which, upon closer examination by him in opening the top flap, was discovered to contain U.S. currency. The FBI agents and CPD Sgt. Sanchez were extremely upset with officer Murphy for looking inside the bag which action exceeded the purpose and scope of their mission and Murphy was thus quickly removed from Rucker's apartment.[35]

30. To the best of SA Sodetz's recollection, the reports from Indianapolis comprised the full extent of the information the agents in Chicago possessed prior to entering the Regents Park complex. He testified that the agents did not obtain any new information to support their initial concern that evidence in Rucker's apartment might be destroyed between the time they entered the building and the time the protective sweep was performed.

31. SA Hanner testified that at the time they entered the apartment, the agents did not know definitively whether there was any evidence in the apartment, but they had probable cause to believe there were at least the proceeds from the alleged drug transaction with Davis that had occurred earlier that afternoon.

32. There was conflicting testimony as to whether Toomer secured entry by unlocking one or two locks on the door. Toomer stated he unlocked only one lock, and that the door automatically locked when it was shut. Rucker testified there were two locks on the door, a regular lock and a deadbolt, and that he had locked both when he left.

33. SA Hanner testified the lights were off in the apartment after Toomer opened the door. The other officers all testified they could not remember if the lights were on.

34. This method principally involves looking in the normal places a person could hide, including opening doors and looking under beds, but it does not include the use of "flash-bangs," running from room to room, or "dynamic entries."

35. Officer Murphy testified that he had the impression the agents in charge of the investigation had obtained consent to search. Upon entering the apartment, he saw a closet to his right and went to secure it. He opened the closet door and saw three or four bags on the floor and noticed the top bag in particular. The top bag was partially open and he saw what he at first thought were bundles of cocaine. He opened the top of the bag and discovered that it contained bundles of money, not drugs. Murphy said he only looked in the bag for two to three seconds, whereupon he stood up and announced that he had found something in the closet. Sgt. Sanchez

Following the protective sweep, the law enforcement officials exited the apartment and decided to obtain a search warrant. SA Hanner returned downtown to FBI headquarters to work on the probable cause affidavit and, at approximately 3:00 a.m., SA Emigh also traveled downtown to help draft the affidavit. Special Agents Derbeas and Sodetz posted themselves in the corridor outside Rucker's door to ensure that no one entered the apartment while they awaited the issuance of a search warrant.[36] SA Sodetz testified that after everyone had left the apartment, they closed the door and no one left or entered the apartment until Rucker arrived later in the morning. No effort was made to inspect the adjoining apartments to ascertain if they were occupied.

Meanwhile, in Indianapolis, at approximately 10:00 p.m. on March 30, 2004, SA Schulstad was working on the probable cause affidavit in support of a search warrant for Rucker's apartment in Chicago.[37] His first draft of the affidavit was sent to SA Hanner and Assistant United States Attorney Thomas Shakeshaft ("Shakeshaft") in Chicago at 2:48 a.m. (Indianapolis time) on March 31, 2004.[38] AUSA Shakeshaft and SA Hanner returned the draft affidavit with suggestions and corrections; several rounds of revisions were exchanged in this manner. At some point between 1:30 a.m. and 3:30 a.m. (2:30 a.m. to 4:30 a.m. Indianapolis time), SA Hanner was advised by a Chicago-based AUSA that, given the hour, they would not contact a magistrate judge until normal working hours in Chicago later in the morning. At approximately 4:00 a.m., SA Scott Ballock ("Ballock") assumed responsibility in Indianapolis for completing the affidavit, working until 7:30 a.m. (Indianapolis time), at which time he sent the final version to Chicago at 8:00 a.m. (Indianapolis time).[39]

---

promptly told Murphy to step outside the apartment and informed him for the first time that they did not have a search warrant and that he should have not touched anything.

At this time, in March 2004, Murphy had only been on the narcotics squad for a few months and according to his testimony had simply misunderstood his instructions at the time of the sweep, believing they were there to perform a consent search.

36. Special Agent Sodetz had initially stationed himself on the ground floor of the apartment complex, but later moved to Rucker's apartment door after SA Emigh had departed, where he and SA Derbeas waited through the night.

37. The affidavit was prepared for signature by SA Hanner, who would swear to the veracity of the information before a magistrate in Chicago. Because Indianapolis agents had been primarily responsible for the investigation up to that point, SA Schulstad prepared the probable cause affidavit for Rucker's apartment in Indianapolis for transmission to SA Hanner in Chicago for presentation to a magistrate.

38. Normally, the affidavit would have been sent as an attachment in a bureau-to-bureau email, but for whatever reason the equipment was not working on the night in question. As a result, SAs Schulstad and Hanner had to utilize other, more time-consuming methods of electronic communication. The time stamp on the email indicated it was sent from Indianapolis to Chicago at 23:48 Pacific Standard Time.

39. SA Schulstad did not speak to SA Derbeas before SA Derbeas had entered Rucker's apartment for the protective sweep, but Schulstad was subsequently informed that a CPD officer had found a black bag containing money in Rucker's apartment. SA Schulstad does not remember at what time he learned this information; however, neither he nor Ballock included any facts learned from the protective sweep in the affidavit. At an unidentified time, an AUSA in Chicago was also advised that a black bag full of money had been found in the protective sweep.

Ultimately, events beyond the agents' control rendered moot their efforts to draft the probable cause affidavit in support of a search warrant. The Marion County Jail, which monitors calls made by inmates, discovered Davis had succeeded in getting a voice message to Rucker from the Marion County jail at approximately 5:00 a.m. on March 31, 2004, when Davis first got access to a telephone. By telephoning Angela Graham, a three-way call was initiated by her and Davis to a number which Rucker was known to utilize, where Davis left a message. Law enforcement officials believe that Davis's message was a coded warning to Rucker to "clean out" his apartment.[40] Rucker testified at the hearing that he had received this message, but that he did not understand what Davis was trying saying.

Regardless of whether Rucker actually understood Davis's message or merely

showed up at the apartment for work as usual the next day,[41] he returned to his Regent Park apartment between 6:30 a.m. and 6:45 a.m. (Chicago time) on March 31, 2004,[42] and encountered SAs Sodetz and Derbeas waiting in the hallway outside his apartment. Rucker and SA Sodetz present differing accounts of the ensuing encounter between them, which versions, though substantially similar in most respects, vary on certain details as well as the sequence of events.[43]

SA Sodetz testified that, as they waited for Rucker in the hallway, he thought, because so much time had already passed, Rucker would likely not return to his apartment because he believed Rucker had likely learned of their presence there. He was therefore surprised when a man fitting Rucker's description emerged from the nineteenth floor elevator pushing an empty shopping cart.[44] Shortly after

---

**40.** The message stated:

> Double R, its Prenny Mo nigga. I got hit in the, I got hit in the head on the way back from the chicken coop. Hey, I'm a soldier tho, you ain't gotta worry 'bout that, but just, uh, that little piece of paper you gave me, ear-earlier that day, they was askin' questions about that, see what I'm sayin' and, so goahead and clean yourself up my nigga. Hey (unintelligible), check, check on my girl, call my girl. She'll talk to ya, (unitelligible) keep in touch with her, ...

Government's Exhibit 13 at 3. Davis concluded the call by twice stating Angela Graham's telephone number and mentioning her nickname, "PP." *See* Gov. Ex. 13.

**41.** Rucker testified that he had owned the 5050 Lake Shore Drive apartment for two years and that he used the location for his business, named "R & R Investments," which involved real estate investing; that morning, he said, he was just showing up for work as usual.

**42.** As recalled by SA Sodetz.

**43.** Both witnesses agree that: SA Sodetz and SA Derbeas identified themselves as FBI agents; Rucker was searched for weapons; Rucker attempted to leave on the elevator and SA Sodetz, in order to forestall Rucker's de-

parture, initiated physical contact with Rucker' by taking hold of his arm in a restraining gesture; Rucker suggested that they speak downstairs in the lobby, but the agents declined that suggestion; Rucker asked the agents if they possessed a search warrant, and was told they did not but that other agents were in the process of obtaining one; Rucker asked the agents if they had an arrest warrant for him,. to which they responded they did not; ·the agents informed Rucker they believed there were proceeds from a drug transaction in his apartment, and if he allowed them to search the apartment, they would seize the money, give him a receipt and then let him go; Rucker asked the agents if they had already been inside his apartment, which the agents denied; the agents asked Rucker three to five times for consent to enter/search his apartment before he eventually did give his consent; Rucker was not advised of his constitutional (*Miranda* ) rights in the hallway; Rucker was not free to leave during this entire exchange; and at the end of the encounter, Rucker himself opened the door to the apartment and allowed the agents to enter and conduct a search.

**44.** Rucker testified that he brought the cart to help him carry clothes down to his car after work that he was planning to give to his nephew.

Rucker arrived, SA Derbeas called SA Hanner and SA Emigh to ask them to return to Rucker's apartment. SA Sodetz testified that he asked the otherwise unidentified, approaching man his name, to which the man responded "Roger." SA Sodetz, assuming this was Rucker, then informed him that he was being detained and asked him to turn around so they could pat him down for weapons. SA Sodetz testified that Rucker was frisked because he was the target of a narcotics investigation and the agents sought to protect themselves from being in a position where their safety was in jeopardy.[45] SA Sodetz testified that Rucker cooperated in the patdown search and no weapon was found on his person. SA Sodetz also testified that Rucker was not handcuffed nor was Rucker "manhandled" in any way. SA Sodetz testified that Rucker then asked what was happening and SA Sodetz replied that they were conducting an investigation and wanted to talk with Rucker. SA Sodetz suggested it would be better to go inside Rucker's apartment to talk, but Rucker resisted, saying he did not want to go inside his apartment. Rucker then expressed his preference to go downstairs to talk, but the agents declined. The officers asked Rucker to consent to their entry into the apartment, but Rucker refused. Rucker then pressed the elevator button and, when it opened, attempted to enter the elevator to go downstairs.[46] SA Sodetz testified that in an effort to deter Rucker's precipitous departure, he lightly took hold of Rucker's arm and told him not to leave on the elevator while the agents were still talking to him. Rucker acquiesced, asking if he was under

arrest and SA Sodetz informed him that though he was not under arrest, it was no mistake that the federal agents were there.[47] SA Sodetz further told Rucker that the agents knew about the earlier transaction with Davis and wanted to get Rucker's consent to search his apartment. SA Sodetz informed Rucker that they did not have a search warrant, but said that they intended to get a search warrant and that in fact at that very moment agents were in the process of obtaining one at their office downtown. SA Sodetz testified that Rucker was advised that his consent would have to be voluntary and he was not in custody, and agents therefore did not inform of his constitutional rights (*Miranda*) at this time. SA Sodetz also told Rucker that they thought there were illegal items in his apartment for which they wanted to look, but Rucker responded saying there was nothing illegal in the apartment. SA Sodetz testified he told Rucker they believed there was a large sum of money in the apartment and, if Rucker gave them consent, they would enter the apartment, seize the money, give Rucker a receipt for the seized money, and leave. At some point, Rucker asked the agents if they had already been in the apartment, which the two agents both denied. SA Sodetz testified Rucker finally responded, "You can go ahead and take the money and then you guys leave," whereupon Rucker opened the apartment door to permit entry by the two agents. SA Sodetz testified they entered the apartment at about 6:50 a.m., approximately five minutes after their initial contact with Rucker.

45. SA Sodetz testified that experience teaches that individuals involved in the narcotics trade often carry firearms.

46. SA Sodetz testified that Rucker's attempt to leave in the middle of the conversation raised concerns for law enforcement since they were in the midst of an investigatory stop.

47. SA Sodetz testified that he did not remember if this exchange occurred before Rucker attempted to enter the elevator or after he had entered it.

SA Sodetz testified that during this encounter neither of the agents drew a weapon, Rucker was never handcuffed, and the only times Rucker was physically touched was during the pat down and when SA Sodetz took Rucker by the arm in an attempt to stop him from getting on the elevator while the agents were asking him questions. SA Sodetz described his discussions with Rucker as cordial during which Rucker was very calm and their voices were never raised.

Rucker's version of events differs only slightly. He testified that when he got off the elevator, he saw two Caucasian men sitting on the floor, who immediately jumped up. Rucker asked them who they were, and they responded they were FBI agents. Rucker then asked what they were doing, to which SA Sodetz responded that they were there for the money. Rucker says he asked if they had a warrant for his arrest, and the agents responded that they did not. At this point, Rucker testified that he said goodbye and attempted to leave on the elevator, but SA Sodetz pulled him off the elevator by his left wrist and pushed him up against the wall, placing him into a spread eagle position. Rucker says he was then told not to try to leave again. Rucker testified that at this point the agents displayed their guns and bulletproof vests. Rucker asked why he was being detained, and SA Sodetz responded that the agents were just there for the money. Rucker says he was then escorted by SA Sodetz to the other side of the elevator, and, as he glanced back, he saw the second officer (SA Derbeas) closing the door to his apartment and heard the lock clicking shut. Rucker asked if the agents had already been in his apartment, but they swore to him they had not. Rucker testified that he asked if there was a search warrant, and SA Sodetz said no, but there was one coming. Rucker says he then suggested going downstairs to talk in the lobby, but the agents refused, saying they would continue talking right there in the hall.

Rucker says he was asked for consent to search his apartment five or six times before he consented. Rucker also testified that the agents' demeanor with him was firm when asking for the money and that their voices were raised. Rucker testified they spent fifteen to twenty minutes in the hallway before he finally gave consent, and that he only consented because he did not think he could leave, he thought he had no other choice, and he knew the agents had already been in his apartment because he saw them shutting the door. Finally, he testified that when he opened the door to his apartment he saw several things that indicated his apartment had already been searched, including that his paperwork had been shuffled, there were footprints in the carpet, the lights were on, a chair had been moved away from the table, the foyer closet door, rather than being closed as he left it, was opened a crack, and the double lock on the door had not been locked. However, the agents again swore to him that they had not previously been in the apartment.

SA Sodetz testified that, according to the notes he took that day, Rucker signed the consent to search form at approximately 7:10 a.m. after he and SA Derbeas had talked to him on the couch in the apartment and presented him with the consent form and explained it to him. Rucker was asked if it was alright if the two other agents, SA Hanner and SA Emigh, entered the apartment, Rucker gave his consent to their entry and to the search, and signed the form evidencing his consent. Rucker testified, in contrast, that once inside the apartment, he was forced to sit at the dining room table and that the agents kept talking about the money. He said the agents told him they were there for the money and that it did not really matter

if he signed the consent form because a search warrant was coming. Rucker claims the officers told him that they were tired from having waited up all night for him and that is why they just wanted him to hurry up and consent. Rucker says he signed the consent form because he was "worn out" and did not think the FBI agents would leave otherwise. During the conversation, SA Sodetz asked Rucker if there was a large amount of cash in the apartment to which Rucker responded there was approximately $300,000 in the foyer closet. SA Derbeas retrieved the three bags in the foyer closet, two containing cash, and the third containing a large electric money counter. A fourth bag contained clothes which were, Rucker claimed, his gym clothes.

After Rucker signed the consent form, SA Emigh and SA Sodetz assumed responsibility for interviewing Rucker, while SA Hanner and SA Derbeas completed the search of the apartment.[48] Agents Emigh and Sodetz obtained basic biographical information from Rucker, who told them that he was self-employed and dealt in investment properties.[49] Rucker said he earned the money found in the bags by playing cards and dice with his friends, not in a casino, and he thought that his apartment was a safe place to keep the money. Rucker mentioned that he used to be married but was now divorced, and that he had a ten-year-old daughter who lives with his ex-wife, Twanda Miller. When SA Sodetz commented that the apartment was very neat, Rucker responded that he is a very neat person and that his friends all comment on that.

According to SA Sodetz's notes, the search was completed at 8:10 a.m. During the search, the agents discovered a Toshiba laptop computer and an electronic orga-

nizer, and, when asked if he would consent to the search of these items, Rucker again agreed. SA Sodetz's notes further indicate that this second consent form was signed at approximately 8:20 a.m., after which the agents briefly inspected the laptop and the organizer, but found nothing immediately suspicious. Finally, SA Emigh asked Rucker for his consent to inspect the cellphone he used, but Rucker declined to give consent. No action was taken against Rucker for refusing consent to search his telephone. The agents seized a total of $317,445 in U.S. currency and a set of digital scales from Rucker's apartment.

After the search was completed, Rucker was released. An arrest warrant was issued for Rucker later that day on March 31, 2004, in Indianapolis, Indiana.

### Legal Analysis

■ The defendant moves to suppress evidence under the Fourth Amendment on the grounds that the currency and scales seized during the search of his home were fruits of an unconstitutional entry, illegal detention, and invalid consent and, as such, are inadmissible as evidence at his trial. The defendant bears the burden of establishing that the search was illegal. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *U.S. v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985).

In ruling on this motion, we are faced with three primary legal issues to resolve. First, the defendant contends that the initial entry into his apartment was an unjustified entry because there was no true emergency reason for the police to conduct a protective sweep of his apartment. Given that the initial entry was illegal, Rucker argues, the discovery of currency and electronic scales by the police investigators in

---

**48.** SA Derbeas apparently has had special training in conducting searches.

**49.** Rucker claimed he earned a salary of approximately $80,000 a year from real estate development.

the course of the subsequent search, even though consented to by Rucker, flows directly from the allegedly illegal entry and thus warrants suppression at trial. Second, Rucker asserts that his consent was invalid as incident to an illegal seizure of his person by the FBI agents, as the fruit of the poisonous tree of the initial illegal entry into his apartment and as the product of government coercion. Third, the government contends that, even if we were to find both the initial protective sweep illegal and Rucker's consent to be invalid, the evidence seized is properly admissible under the doctrine of inevitable discovery.

### A. Protective sweep of Rucker's apartment.

■ The government defends the warrantless protective sweep of Rucker's apartment as constitutionally justified because of exigent circumstances, to wit, that the federal agents were reasonably convinced that someone might be inside Rucker's apartment attempting to destroy evidence/contraband, and, in addition, that the sweep was necessary to ensure the safety of the law enforcement officers who were posted outside the apartment door. Rucker counters that the government agents' concerns were contrived because at the time of the protective sweep there was no evidence of any imminent attempts to destroy evidence/contraband.

■ If a defendant establishes that a police entry was illegal, the seized evidence, even if obtained pursuant to an otherwise valid consent to search, is presumptively inadmissible, unless the government can prove by a preponderance of the evidence that the consent was sufficiently attenuated from the unlawful entry to purge the primary taint of the prior illegality. *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Searches inside a home without a warrant are presumptively unreasonable; however, such searches can be permitted when probable cause and exigent circumstances exist. *United States v. Marshall,* 157 F.3d 477, 481 (7th Cir.1998). The Supreme Court has emphasized that exceptions to the warrant requirement are "few in number and carefully delineated, and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests" *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quotation omitted). Included as an example of exigent circumstances that may justify a warrantless entry into a home is the need to prevent the "imminent destruction of evidence." *United States v. Lenoir,* 318 F.3d 725, 730 (7th Cir.2003) (citing *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)). A warrantless search will be allowed only when the police have "a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." *Id.* (quoting *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *United States v. Webb,* 83 F.3d 913, 916 (7th Cir.1996)).

Rucker argues that, pursuant to the Seventh Circuit's decision in *United States v. Rosselli,* we should, in evaluating the government's alleged emergency circumstances, "appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." 506 F.2d 627, 630 (7th Cir. 1974). Specifically, in *Rosselli,* the Seventh Circuit disapproved of law enforcement officers eschewing pursuit of a warrant and placing themselves instead in a situation where emergency circumstances would necessitate a warrantless entry.[50]

---

**50.** The relevant facts in *Rosselli* are as follow:

Ten or fifteen minutes after leaving [the

In addition, the Seventh Circuit concluded that in certain circumstances the need to uphold the use of search warrants can trump the "emergency" of imminent destruction of evidence.[51]

A review of the facts in our case indicates that law enforcement officers possessed an altogether reasonable belief that evidence in Rucker's apartment was in danger of being destroyed, thereby justifying their warrantless entry for purposes of conducting a protective sweep. At the time they decided to enter to conduct a protective sweep, the FBI agents knew that Davis had been arrested on his return to Indianapolis with a large quantity of cocaine which he had likely acquired from Rucker in that apartment in exchange for a large amount of currency. They also knew that Dramane Johnson and other associates of the 34th Street Gang were actively and somewhat frantically attempting to destroy evidence/contraband in Indianapolis. Further, the agents knew that

Rucker had attempted to contact Davis by phone six times during the evening after the time Davis should have arrived back in Indianapolis, and, when unable to reach him, likely would have inferred that trouble had befallen Davis. There was no reasonable way for the agents to determine whether someone in Indianapolis had managed to contact Rucker or an unknown associate of Rucker's in Chicago about Davis's arrest, to advise him to undertake a similar destruction of evidence.[52] Accordingly, on this basis, we hold that the agents' decision to conduct a protective sweep of the apartment to ensure against the destruction of evidence was reasonable under all the circumstances and thus satisfied the requirements of the Fourth Amendment.

Moreover, Rucker's reliance on *Rosselli* is misplaced. The Seventh Circuit has enunciated two pertinent bases for distinguishing *Rosselli* from the present case. First, in *Rosselli*, the police made no at-

apartment building of an associate arrested with marijuana], the agents arrived at defendant's, and proceeded to apartment No. 6. After they knocked on the door, they heard an indistinct response—either 'Who?' or 'What?' An agent then knocked again, called out defendant's name, and stated: 'It's the police, we want to talk to you.' They then heard a scuffling movement inside the apartment, someone engaging the front door chain lock, a voice calling, 'Don't open the door for anybody,' and footsteps running from the door to the rear of the apartment. The agents thereupon kicked down the door and entered.

*Id.* at 628.

**51.** The Seventh Circuit explained its decision in the following passage:

In reaching this conclusion we have attached importance to the character of defendant's expectation of privacy, his unquestioned right to refuse admittance to his home unless a demand was supported by a warrant, the government's opportunity to anticipate and avoid the need to rely on an emergency justification, the less-than-com-

pelling character of the evidence that a true emergency did exist, and, finally, to the quality of the social interest which the invasion of the defendant's home was intended to vindicate. We accept the premise that the importance of seizing mere evidence— as opposed to contraband or the fruits or instrumentalities of crime—may justify a warrantless entry in extreme cases. But when the emergency involves no grave danger to the lives of the officers or others, and when the event the officers were seeking to prevent would itself remove the contraband from circulation, society's interest in upholding the seizure weighs less heavily against the individual's interest in privacy than it might in other pressing circumstances.

*Id.* at 631.

**52.** The reasonableness of the law enforcement officers' concerns over the imminent destruction of evidence, however, was in our view somewhat diminished, given the several preliminary indications they received that the apartment was not occupied prior to initiating their protective sweep.

tempt to obtain a search warrant before proceeding to Rosselli's apartment; in contrast, in this case, preparation of the warrant application was being conducted contemporaneously with the occurrence of the exigent circumstances and was virtually complete. *See United States v. Marshall,* 157 F.3d 477, 483 (7th Cir.1998). Second, in *Rosselli,* the evidence of exigent circumstances consisted solely of the possibility that a girlfriend of the defendant's brother might have notified the defendant that some of his accomplices had been arrested; however, as the Seventh Circuit pointed out, since the girlfriend had been at the apartment where some of the other defendants were arrested, the police could easily have posted some agents with her until a warrant was obtained. *Rosselli,* 506 F.2d at 629. Here the exigent circumstances were unequivocal regarding the potential destruction of evidence. Most importantly, the Seventh Circuit explained that its reasoning in *Rosselli* is not applicable to a situation where "there was no possible way in which the agents could have prevented such a call and they were entitled to assume that someone would, in fact, make it." *Id.* (citing *United States v. Rubin,* 474 F.2d 262 (3rd Cir.1973)).

■ These distinctions accurately describe the situation in the case at bar in which there were several individuals, both known and unknown to law enforcement, who the federal agents reasonably believed could have informed Rucker of Davis's arrest, and none were in police custody or under police control. *See also United States v. Altman* 797 F.2d 514, 516 (7th Cir.1986) (distinguishing the facts in *Rosselli* on similar grounds). In addition, the federal agents knew enough time had passed since Davis's arrest for word to have passed to Rucker and agents reasonably believed that Rucker would have a strong interest in acting on any tips he received by getting rid of any contraband in his apartment left from the Davis transaction. Accordingly, in our view, *Rosselli* does not trump or otherwise negate the significance of the law enforcement officers' legitimate and reasonable fear that Rucker or someone else in his apartment may have been advised to destroy evidence, thus justifying their protective sweep in light of that exigency.[53]

B. *Consent search of Rucker's apartment.*

Rucker next contends that his consent to search was invalid because it was incident to an illegal seizure of him and was

**53.** Having concluded that *Rosselli* supports the primary exigency argued by the government, we nonetheless state that we are of the opinion that the secondary grounds advanced to justify the warrantless entry do not hold up under the *Rosselli* standards. SA Sodetz testified that the law enforcement officers feared that: (1) anyone present in the apartment would be a threat to the officers who were posted outside the door and (2) that the phone call to Rucker's apartment and the knock on the door may have alerted a person in the apartment to the presence of law enforcement officers. These concerns arose solely as a result of their decision to locate themselves outside Rucker's apartment and to attempt to contact him. This type of "exigency as inhered in these conditions ... was of the

agents' own making." *United States v. Napue,* 834 F.2d 1311, 1327 n. 17 (7th Cir.1987). In *Napue,* the Seventh Circuit directed: "We will not expand the exception made for emergency security checks by permitting the agents to 'create their own exigencies ... and then 'secure' the premises on the theory that the occupants would otherwise destroy evidence.' " *United States v. Napue,* 834 F.2d 1311, 1327 n. 17 (7th Cir.1987) (quoting *United States v. Allard,* 634 F.2d 1182, 1187 (9th Cir.1980); *Rosselli,* 506 F.2d at 630). Accordingly, we conclude that the "exigencies" that developed subsequent to the law enforcement officers' entry into the apartment complex solely as a result of such entry are not sufficient to justify their warrantless entry into Rucker's apartment.

coerced from him by SA Sodetz and SA Derbeas. The government counters that the brief detention of Rucker was a constitutionally permissible *Terry* stop and that Rucker's consent which he provided during the detention was voluntary and uncoerced and that the resulting search was thus consistent with constitutional requirements. We first address whether the detention of Rucker was consistent with the requirements for a *Terry* stop, and, second, whether evidence establishes the requisite voluntariness of Rucker's consent.

 (1) *Terry stop of Rucker in the apartment hallway.*

██ We conclude that the actions of SA Sodetz and SA Derbeas in detaining Rucker in the apartment hallway constituted a constitutionally permissible *Terry* stop. Under the principles established in *Terry v. Ohio* and its progeny, even without probable cause, law enforcement officers "may conduct an investigatory stop, limited in scope and executed through the least restrictive means reasonable." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir.2002) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In order to make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868; *United States v. Swift*, 220 F.3d 502, 506 (7th Cir.2000). The Supreme Court defined a reasonable suspicion as "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

██ To evaluate the reasonableness of a *Terry* stop, we first look to see "whether the officers' actions were justified at the inception of the stop;" and then we examine "whether the stop was reasonably related in scope to the circumstances that justified the stop in the first place." *Jackson*, 300 F.3d at 745 (citing *Swift*, 220 F.3d at 506). This analysis "involves a consideration of 'the totality of circumstances known to the officers at the time of the stop'" *Id.* at 745–46 (quoting *Swift*, 220 F.3d at 506; *United States v. Quinn*, 83 F.3d 917 (7th Cir.1996)). To determine the reasonableness of the officers' actions, a court may properly consider the experience of the law enforcement agents as well as the behavior and characteristics of the suspect. *Id.* (quoting *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir.1995)). As the Seventh Circuit recently explained, "The fault line between an investigative detention and an arrest is flexible and highly fact-intensive" and "there is no 'litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop' and becomes an arrest.'" *United States v. Stewart*, 388 F.3d 1079, 1084–85 (7th Cir.2004) (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994); *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). The Court's inquiry focuses on "whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness." *Id.* (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). We note that in recent years, the permissible scope of a *Terry* stop has expanded to include significant police restraints on a suspect's liberty, including the use of handcuffs and extended detentions in squad cars. *See, e.g., Vega*, 72 F.3d at 515 (holding that a *Terry* stop did not become an arrest when officers drew their weapons and detained a suspect in a squad car for over an hour); *Tilmon*, 19 F.3d at 1224–25 (affirming the reasonableness of a stop of an armed bank robbery suspect in which officers completely surrounded the suspect's car and drew their guns).

For three primary reasons, we hold that the facts in this case clearly indicate that,

pursuant to *Terry,* SA Sodetz and SA Derbeas were constitutionally justified in detaining Rucker and that their actions fell well within the constitutional boundaries of a *Terry* stop.

■ First, when Rucker emerged from the elevator, SA Sodetz and SA Derbeas had, at the very least, a reasonable suspicion that Rucker had been involved in an illicit narcotics transaction with Davis the previous day, he had received Davis's message sent after Davis's arrest and detention from the Marion County Jail,[54] and at the moment of their initial encounter with Rucker as Rucker was arriving pushing an empty grocery cart, he was attempting to return to his apartment either to remove or to destroy evidence/contraband. Second, Rucker's suspicious behavior of arriving early in the morning pushing an empty shopping basket and responding furtively to the agents' initial inquiries when the officers confronted him outside the elevator heightened the agents' reasonable suspicions. Third, we note that SA Sodetz testified the agents were startled when Rucker exited the elevator and that they reasonably believed he might be in possession of a firearm.[55] Accordingly, consistent with the Fourth Amendment, the agents were justified in briefly restraining him and in then detaining Rucker, patting him down for weapons, and conducting a brief inquiry to further their investigation.

■ The next step in our analysis is to evaluate the reasonableness of the FBI agents' actions after the they initiated the *Terry* stop, which we conclude for three reasons were constitutional as well. First, we note that the restraints that SAs Sodetz and Derbeas placed on Rucker's freedom were minor, falling far short of the permissible boundaries of a *Terry* stop. There is no indication the officers exercised undue force[56] or threats[57] in the encounter or that they detained Rucker for an excessive period of time. The agents never drew their weapons, they never handcuffed Rucker, they never manhandled Rucker,[58] nor did they engage in any conduct transforming the temporary detention into an arrest. *See Stewart,* at 1084–85. Second, the agents reasonably confined the scope of their actions to the circumstances that justified the initial detention of Rucker. The testimony of both Rucker and SA Sodetz are in agreement that there were three principle phases of the *Terry* stop: confirming Rucker's identity, searching Rucker for weapons, and attempting to obtain Rucker's consent for

54. At this point, the SA Sodetz and SA Derbeas knew, from correspondence with FBI agents in Indianapolis, that approximately two-and-a-half hours before Rucker arrived pushing the empty shopping cart Davis had finally succeeded in leaving a message for Rucker to "clean out" the Lake Shore Drive apartment.

55. Sodetz testified that in his experience individuals involved in drug transactions often carry firearms.

56. During the contact, Rucker attempted to prematurely terminate the encounter, thus hampering the agents constitutionally permissible investigatory stop. Moreover, we noted at the hearing that in terms of their size, there is physical parity between Rucker and SA Sodetz. We conclude that SA Sodetz exer-

cised only the amount of force necessary to prevent Rucker from departing during their initial questioning of him.

57. We do not consider the agents' statements about obtaining a search warrant to constitute undue threats because those statements accurately described the ongoing actions of other FBI agents at their office in downtown Chicago.

58. Although SA Sodetz did take hold of the arm of Rucker, that incident falls far short of "manhandling," and, other than that brief and minor encounter, we note there is no indication the agents were physically threatening to Rucker.

a search of his apartment.[59] All of these actions were consistent with the agents' reasonable suspicions that prompted the detention and, we conclude, were consistent with the requirements of the Fourth Amendment. Third, the agents limited the *Terry* stop to a short period of time. The testimony established that, at the longest, the stop lasted fifteen minutes, but more likely lasted closer to five minutes. Therefore, we conclude that the actions of SA Sodetz and SA Derbeas during the *Terry* stop were reasonable, given the scope and nature of the circumstances surrounding Rucker's brief detention.

### (2) *Voluntariness of Rucker's consent.*

 Having determined that Rucker's detention by SA Sodetz and SA Derbeas conforms to the requirements of the Fourth Amendment, our final consideration relates to whether Rucker's consent to search was voluntary; we conclude that it was. Consent searches are only valid if the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The question of whether a consent was voluntary, as opposed to the product of duress or coercion, "is a question of fact to be determined from the totality of the circumstances." *Id.* at 227, 93 S.Ct. 2041. The voluntariness of a consent must be proven by the government by a preponderance of the evidence. *Id.* at 222, 93 S.Ct. 2041; *United States v. Lechuga*, 925 F.2d 1035, 1041 (7th Cir.1991). In this case, the totality of the circumstances supports the conclusion that Rucker's consent to the search was voluntarily obtained. Rucker was detained for, at most, fifteen or twenty minutes before he consented, and despite their persistence, we cannot say that Rucker was badgered into consenting in a way that overrode his freedom to make that decision.[60] He was not handcuffed, nor physically abuse or pressure him, and the encounter with the FBI agents in the hallway generally proceeded calmly and cordially.[61] In substantially similar cir-

---

59. As part of their on-going investigation, SA Sodetz and SA Derbeas reasonably expected to obtain Rucker's consent for a search of his apartment. The fact that Rucker actually did consent to the search so quickly precluded the need for the agents to explore other areas of questioning related to his dealings with Davis.

60. There is no a magic number of requests for consent that must be denied before the tactics become coercive or an investigatory stop becomes an illegal detention; we conclude in this case that the agents' actions in continuing to ask Rucker for his consent to search were not unreasonable or overbearing. Rucker was asked for his consent approximately five or six times; however, SA Sodetz and SA Derbeas did not merely repeat their same request each time. Their various requests arose initially as part of the agents' efforts to explain their presence and the investigation, and later as the agents sweetened their initial request for consent (promising to take only the money and then release Rucker). Such conduct by law enforcement agents does not run afoul of the Fourth Amendment.

61. The Defendant urged the court to examine three other facts in assessing the validity of his consent: first, the brief displaying of weapons by the FBI agents in the hallway; second, the agents' threats to obtain a search warrant if Rucker did not consent; and, third, the agents deceit about the fact that they had already entered Rucker's apartment. We conclude that none of these additional factors is relevant to the determination of the voluntariness of Rucker's consent. We address each assertion briefly below.

(1) *Display of a weapon.* Although it is disputed whether a weapon was displayed or Rucker merely observed the weapon of either SA Sodetz or SA Derbeas, even if Rucker was intentionally shown the agents' weapons, this fact would not influence the validity of his consent since the Seventh Circuit has held that the brief display of a weapon does not vitiate valid consent. *See United States v. Rojas*, 783 F.2d 105, 108–09 (7th Cir.1986). This would be true for the additional reason that there was not evidence adduced or basis to conclude here that Rucker was a person of extraordinary sensibilities who would be in-

cumstances, the Seventh Circuit has upheld a suspect's consent as being voluntary. *See United States v. Strache*, 202 F.3d 980, 985–86 (7th Cir.2000); *see also United States v. Duran*, 957 F.2d 499, 503 (7th Cir.1992) (holding a consent voluntary when the suspect was "arrested during the day and without a show of force, was not kept under close restraint at the station, and was not subject to an aggressive display of weaponry, and was not harshly interrogated"). The fact that Rucker was not explicitly advised of his right to refuse consent does not detract from our conclusion. "The lack of a warning does not prove that consent was involuntary; it is simply another factor to be considered in

the totality of the circumstances." *White*, 979 F.2d at 542 (internal quotation marks omitted). Here the consent form that Rucker signed expressly acknowledged: "I have been advised of my right to refuse consent," Gov. Ex. 7, and SA Sodetz testified that he had explained the form line-by-line to Rucker. Most importantly, Rucker clearly demonstrated he understood his right to refuse because he declined to consent to a search of his cellular telephone. Accordingly, we find from the totality of the facts in this case that Rucker's voluntary consent to the search was not coerced from him by the actions of the FBI agents and, therefore, the search of his apartment was constitutionally permissible.[62] Even if we were to decide other-

---

timidated or his will overborne by viewing a weapon in the possession of a law enforcement agent.

(2) *Threats to obtain a search warrant.* Although baseless threats to obtain a warrant may vitiate consent, *see United States v. White*, 979 F.2d 539, 542 (7th Cir.1992), there are numerous indications in the record that the agents' comments about obtaining a warrant accurately described their belief that they had ample probable cause for a warrant and the actions of their colleagues at FBI headquarters then underway to obtain a warrant in downtown Chicago. When law enforcement officials' expressed intention to obtain a warrant is genuine, and not merely a pretext to induce submission, it does not vitiate consent. *Id.; United States v. Duran*, 957 F.2d 499, 502 (7th Cir.1992); *United States v. Colonia*, 870 F.2d 1319 (7th Cir.1989).

(3) *Deceit about prior entry into Rucker's apartment.* If Rucker had believed the agents' ruse about the lack of prior entry into Rucker's apartment, this fact would have reinforced a finding that his consent was voluntary. The agents' lying about the previous entry, we believe, was likely an attempt to give Rucker a fair opportunity to render his voluntary consent to a search. However, Rucker testified that he did not believe that the ruse. Regardless of the apparent lack of success of the ruse, it does not influence our determination of voluntariness because the Seventh Circuit has held that trickery, deceit, even impersonation by law enforcement do not overcome a suspects voluntariness, unless

government agents make threats or promises. *Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir.2004) (holding: "Although the law permits the police to pressure and cajole, conceal material facts, and actively mislead, it draws the line at outright fraud, as where police extract a confession in exchange for a false promise to set the defendant free") (internal quotation omitted); *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir.2001) (discussing how trickery, deceit, and impersonation do not undermine the voluntariness of a confession); *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding police misrepresentation did render a confession involuntary); *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir.1990) (holding that "far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead") ; *see also United States v. Byram*, 145 F.3d 405, 408 (1st Cir.1998) (explaining that "trickery is not automatically coercion. Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect. While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been upheld as voluntary in a number of situations").

**62.** In his motion to suppress, Rucker also seeks to exclude statements he made to federal agents during the search of his apartment. Although the government has not indicated

wise, we would uphold the search under the doctrine of inevitable discovery as discussed below.

## C. *Doctrine of inevitable discovery.*

■ If Rucker's consent to search is deemed invalid, the government contends that the evidence discovered in the search nonetheless warrants admission under the doctrine of inevitable discovery. The government asserts that because agents in Indianapolis and Chicago had been working the entire night prior to their confrontation with Rucker at his apartment to prepare a probable cause affidavit in support of a warrant to search Rucker's apartment, and because the probable cause was clearly established by the facts known to the agents at the time, the search would inevitably have occurred with a warrant and the evidence would have been discovered and seized. Rucker counters that there is no evidence that the government actually intended to present the probable cause affidavit and obtain a warrant. We disagree with Rucker's description of events on this point, as adduced at the hearing.

■ The inevitable discovery doctrine allows the use of evidence if the government can show that the information "ultimately or inevitably would have been discovered by lawful means." *United States v. Brown*, 328 F.3d 352, 357 (7th Cir.2003) (quoting *United States v. Gravens*, 129 F.3d 974, 979 (7th Cir.1997)). To demonstrate that a discovery was truly "inevitable," the prosecution must establish that it had probable cause and prove the existence of "a chain of events that would have led to a warrant ... indepen-

dent of the search." *Brown*, 328 F.3d at 357 (quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir.1995)); citing *United States v. Jones*, 72 F.3d 1324, 1330 n. 8 (7th Cir.1995). Because "the inevitable discovery doctrine is not an exception to be invoked casually," *Gravens*, 129 F.3d at 980, we apply the doctrine only where is it clear that "the deterrence rationale of the exclusionary rule has so little basis that the evidence should be received." *Brown*, 328 F.3d at 357 (quoting *United States v. Cotnam*, 88 F.3d 487, 496 (7th Cir.1996)).

As in *Brown*, this is not a case in which the government simply disregarded Rucker's constitutional rights and blindly searched his apartment. The record indicates that the agents went to Rucker's apartment with the purpose of securing the location until a search warrant could be obtained or, in the alternative, to obtain Rucker's consent for a search. By the time Rucker's apartment was searched, FBI agents in Indianapolis and Chicago had been working in excess of nine hours to prepare a probable cause affidavit for submission to a magistrate judge in order to obtain a search warrant. In fact, the evidence disclosed that the final version of the affidavit had been completed in Indianapolis shortly before the search of Rucker's apartment began in Chicago. Further, the Assistant United States Attorney in Chicago had stated his intention to contact a magistrate judge during normal working hours that very morning, at which point a search warrant for the apartment would no doubt have been properly issued,

which, if any, statements from Rucker it plans to offer into evidence, we assume only a few of the statements Rucker made during the conversation on the couch are inculpatory in nature, namely, Rucker's comments concerning the location and amount of U.S. currency located in his apartment and the explanation

for how he obtained that money. Rucker has challenged the admissibility of his statements as being fruit of the poisonous tree stemming from the illegal detention and search. Since we conclude that the detention and search were both legal, the statements Rucker made during these events are admissible.

given that there was probable cause established for the issuance of such a warrant, a conclusion about which we have no doubt based on the evidence adduced at the hearing.

As the Seventh Circuit has cautioned, the exclusionary rule is a sanction that is supposed to be proportional to the wrongdoing that it punishes; "The rule should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred." *Brown*, 328 F.3d at 357 (citing *United States v. Salgado*, 807 F.2d 603, 607 (7th Cir.1986)). We have found that the law enforcement agents were justified in searching Rucker's apartment pursuant to his voluntary consent. But even if that were not the case, the agents here, as in *Brown* and *Salgado*, had more than enough information, without evidence uncovered during the arguably invalid consent search or the protective sweep, to obtain a warrant. In *Salgado*, the Seventh Circuit approved applying the inevitable discovery doctrine where the "the warrant would have been obtained and executed even if [the agent] had never made his search." 807 F.2d at 606.[63] Therefore, on this basis, we conclude that the evidence seized from Rucker's apartment would inevitably have been discovered when the agents obtained the search warrant; accordingly, it is not subject to exclusion under the Fourth Amendment.

*Conclusion*

For the reasons stated above, we *DENY* Defendant Rucker's Motion to Suppress.

---

**63.** The Seventh Circuit's reasoning in *Salgado* is especially relevant to the case at hand because the facts are substantially similar to Rucker's:

> The arrest of Bernal with cocaine—Salgado's cocaine—in his possession, coupled with Bernal's statement that it came from 2600 West Golf Road ..., made it more than likely that a search of Salgado's apartment at 2580 ... would turn up contraband or other evidence of Salgado's drug deal-

ings. Thus, information in the agents' possession that owed nothing to Bridges' search abundantly established probable cause for obtaining a warrant—so much so that the agents would have been derelict in their duty had they failed to apply for a warrant based just on what they knew, independently of what Bridges learned and may or may not have told them.

807 F.2d at 606.